[No. H036974. Sixth Dist. Mar. 29, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
VALENTIN NAVARRO RIVAS et al., Defendants and Appellants.

COUNSEL

Solomon R. Wollack, under appointment by the Court of Appeal, for Defendant and Appellant Valentin Navarro Rivas.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant Benjamin Puga Carrillo.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit and John H. Deist, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MÁRQUEZ, J.—A jury convicted defendants Valentin Navarro Rivas and Benjamin Puga Carrillo of the first degree murder of James Lopez and of

firing a gun into an occupied vehicle. It also found true sentence enhancement allegations that Rivas used a gun and that both defendants committed the murder to benefit a criminal street gang. And it found that defendants were principals, either as the perpetrator or as an accomplice, in Rivas's intentional firing of a gun into an occupied vehicle, resulting in Lopez's death. (Pen. Code, §§ 186.22, subd. (b), 187, subd. (a), 246, 12022.5, subd. (a), 12022.53, subds. (d), (e).) The trial court sentenced each defendant to 50 years to life imprisonment.

On appeal, defendants claim that the trial court committed reversible error by providing improper jury instructions and by admitting certain evidence of gang activities that, they claim, violated their right to due process and, in some cases, was substantially more prejudicial than probative.

Although the trial was not free of problems, none of the contentions raised by defendants requires reversal of the judgments, and we will affirm them.

## FACTS

Shortly before 2:00 p.m. on January 12, 2009, James Lopez was driving a car. Ricardo E. was in the passenger seat. A minivan drew alongside Lopez's car. Its passenger, whom Ricardo E. identified with certainty in court as Rivas, taunted, "Where you from, fool?" Lopez held up four fingers, a sign used by the Norteño criminal street gang, and shouted, "Norte." Rivas then fired several gunshots into the vehicle, killing Lopez.

Passenger Ricardo E. described the driver as a clean-shaven Latino with a shaved head who was about 18 years old. Three other eyewitnesses provided testimony about the minivan's occupants. Marisela Zúñiga, Rafael Garcia, and Brenda M. were in the vicinity at the time of the crimes. Zúñiga was working as a school crossing guard and the other two witnesses were traveling in cars. All three had seen the minivan just before the shooting. Neither Garcia nor Zúñiga witnessed the shooting, but Zúñiga heard gunfire.[1] The minivan had called attention to itself through the operator's reckless driving.

Brenda M. was a passenger in a car behind the two vehicles involved in the shooting. She saw the minivan pull up next to Lopez's car and the minivan passenger fire into it.

---

[1] The trial was marked by witnesses' fear of retaliation by the Sureño criminal street gang. Garcia and Zúñiga told police that they feared retaliation and asked for their descriptions of the shooting to be kept confidential. Brenda M. told police that she was reluctant to testify. In court she testified that she was fearful for her family's safety but wanted to be "doing something right" by giving her account in court. When Zúñiga testified at trial, she denied knowing much about the shooting except that it had occurred within earshot, but she acknowledged that she had told the truth to a police officer on the afternoon of the shooting.

Moments earlier, both occupants of the minivan had pulled alongside the vehicle Brenda M. was in and made a gang sign by displaying three fingers. Salinas Police Officer Robert Zuniga, an expert on local criminal street gangs, would later testify that the number three is a means of Sureño gang identification. Zuniga further testified that "[h]and signs are gestures that are commonly made prior to confronting . . . a rival gang member" and that showing three fingers is a Sureño gang sign.

Brenda M. identified both Rivas and Carrillo in court as the minivan's occupants, but named Rivas as the driver and Carrillo as the gunman. Earlier, according to police testimony, she had told police that Carrillo could have been the driver and Rivas the passenger when they showed her photographs of the two suspects, and she testified that her memory was better then.

Garcia told the police immediately after the shooting that he had gotten a good enough look at the driver of the minivan to identify him. He described the driver as a light-complected thin Latino with short slicked-back hair. The driver was in his late teens or early 20's and wore brown gloves and a black jersey from the Oakland Raiders professional football team.

A detective showed Garcia a six-pack photographic lineup on January 21, 2009. As we read the detective's testimony, Garcia identified Carrillo as the driver with no doubt or equivocation. At trial, however, he testified that he failed to get a good look at either vehicle occupant, and he denied identifying Carrillo as the driver to the detective. When shown the photo of Carrillo, which he had initialed in the presence of investigators, he testified that the photo looked "really similar" to the driver, but he could not be "a hundred percent certain." He testified that he had told the police the truth.

It appears from the record that Zúñiga was never able to provide a description of the vehicle's occupants.

The photo of Carrillo shown to the witnesses had been taken on or about January 20, 2009, i.e., eight days after the shooting. Carrillo had a rather prominent goatee in that photo, but Garcia did not describe the driver of the minivan as having facial hair, nor did any other eyewitness.

The three other eyewitnesses also provided testimony about the minivan.

Ricardo E. testified that the minivan was dark green, was dirty or dusty, and had sun-damaged paint on the passenger door, tinted windows, and a sliding side door.

Garcia testified that the minivan was a Chrysler Town and Country or Dodge Caravan, which vehicles he described as virtually identical. He

described it as brown or light green and having rounded contours. He was familiar with that type of minivan because he had previously been shopping for a minivan and had done research on them. He told a police officer that the van was a 1998 to 2000 model Dodge Caravan.

Brenda M. testified that the minivan looked like a 1998 Dodge, with a rounded hood and tinted windows. It was "tannish goldish" or "gold" but not green. Officers found a minivan owned by Carrillo's mother. A photograph of it was shown to Brenda M., Zúñiga, and Garcia. Garcia "immediately" identified the minivan with certainty, while Zúñiga thought the photo probably showed the minivan and Brenda M. thought the photo looked similar to the minivan.

Officers who looked at the minivan characterized its paint as "metallic," and they thought it appeared silver, gold, or green, depending on the lighting conditions and the angle from which an observer would look at the vehicle.

The jury heard evidence that Rivas told police that he if was in the area at the time of the shootings, it was because he was visiting José de la Rosa, whom he regarded as a de facto grandfather. Rivas told the police that he visited de la Rosa about 5:30 p.m.—this would be three and a half hours after the shootings occurred—and stayed for about half an hour, and that de la Rosa mentioned hearing gunshots earlier that day. Rivas added that he, too, heard the gunshots, but said he heard them as he was visiting de la Rosa. (Seconds later during the interview, Rivas denied having intended to say that he heard the gunshots himself.) But de la Rosa testified to a different recollection: de la Rosa had known Rivas since Rivas was four years old, and Rivas visited him regularly at his apartment, but Rivas did not visit de la Rosa on the day of the shootings, nor did de la Rosa tell Rivas about hearing any gunshots. He learned about the killing only through news broadcasts and never heard any gunfire.

Each party summoned a witness with expertise in cellular telephone network technology. They testified in essence that both defendants' cell phones were in the Salinas area when the killing occurred. Beyond that, they could not be more specific. To the extent the records provided any useful information, the People's expert testified that defendants could have been in the vicinity of the crime scene between 1:50 and 2:00 p.m. Against this, the expert acknowledged that Rivas's phone did not connect to the reception site closest to the shooting at the time of the shooting. An investigator testified for the prosecution that it took him at least three minutes and 30 seconds to get to downtown Salinas from the crime scene, and cell phone network records showed that Rivas made a phone call at 1:56 that registered with a downtown Salinas cell phone reception site. The parties agree that the 9-1-1 call about the shooting was made at 1:57 p.m., and according to the testimony of the person who placed it, she called 9-1-1 two minutes after the incident.

Cell phone records showed that approximately 10 calls were placed between the two defendants' cell phones on the day of the shooting, the first at 10:44 a.m. and the last at 5:10 p.m. There were no calls between the cell phones from 1:46 p.m. to 4:31 p.m.

As noted, a Salinas police officer, Robert Zuniga, testified for the prosecution as an expert on local criminal street gangs. He described the nature and operations of these gangs and defendants' involvement with the Sureños in Salinas.

The two main gangs in Salinas were the Norteños and the Sureños, and they were in constant rivalry. Sureño refers to a group of street gangs that share the number 13 or XIII, which stands for the letter "M" in the alphabet, which in turn stands for Mexican Mafia, one of the largest prison gangs and the supreme authority in the Sureño hierarchy. Sureño gangs also shared the color blue, the letter "S," and the number 13. La Posada Trece—*trece* is Spanish for 13—was a Sureño gang set in Salinas. Sureño gangs engaged in shootings, murders, vehicle theft, vehicle burglaries, home invasion burglaries, and selling and distributing narcotics. Sureño gangs associated with sports teams that use a blue motif, such as the Dallas Cowboys. In addition, Sureño gang members often wore black Oakland Raiders football jerseys, but the meaning of doing so was unclear because Norteño members were also known to wear that apparel.

Norteño street gangs operated under the supreme authority of a prison gang called Nuestra Familia (Our Family) and were associated with the number 14 (the letter "N," as in Nuestra Familia, is the 14th letter of the alphabet), the color red, and the apparel of the San Francisco 49ers and Giants. "Even though the Giants don't have the red color," Officer Zuniga testified, Norteños "use the 'SF' to stand for 'scrap free' or 'sucker free.'" "Scrap" is a derogatory term for a Sureño. Norteño gang members used the word *norte* (Spanish for north) to refer to themselves or the gang.

Officer Zuniga opined that Rivas was an active member of the Sureños. Rivas told more than one police officer that he belonged to the La Posada Trece Sureño gang set. He had "LP" tattoos, which stood for La Posada Trece. He had tattoos of three dots on a hand and an elbow. Jail intake records registered him as a Sureño. He had scrawled Sureño graffiti on a wall of his jail cell. Many aspects of Rivas's life illustrated his level of commitment and active support for the gang. The police had often found him in the company of known Sureños. He owned CD-ROM's containing music that Sureños commonly listened to.

Officer Zuniga also opined that Carrillo was an active member of the Sureños. Carrillo told jailers that he was a Sureño and resided in the Sureño

section of the jail. He, like Rivas, had Sureño and La Posada Trece tattoos. As with Rivas, the police had often found Carrillo in the company of known Sureños. One such encounter was particularly significant in terms of Carrillo's modus operandi—its importance will become apparent when we discuss defendants' first claim. Officer Zuniga not only considered this modus operandi in forming his opinion that Carrillo was a Sureño but described it for the jury:

"Q. Did you also consider a contact from May of 2006?

"A. I did.

"Q. . . . [W]hat are the facts of that contact?

"A. Officers were dispatched to . . . a report of a shooting. [¶] A description of a vehicle was given out. One of the officers located the suspected vehicle involved in the shooting. A traffic stop was conducted. Multiple Sureño gang members were pulled out of the vehicle that was stopped. [¶] Officers located a .380 caliber handgun and a .40 caliber handgun. On one of the individuals that [were] removed, it was Mr. Carrillo, where officers located a .40 caliber handgun on him.

"Q. So it was three gang members inside of the vehicle?

"A. That's correct.

"Q. And two had firearms?

"A. Yes.

"Q. One of whom was Mr. Carrillo?

"A. That's correct.

"Q. And during the course of the investigation, did investigators learn why the shooting had occurred?

"A. Yes.

"Q. What did the investigators learn?

"A. One of the individuals involved stated that the shooting happened because the other individuals who were shot at were mad dogging them.

"Q. What does 'mad dogging' mean?

"A. Mad dogging to a gang member is simply staring at each other. It's a form of disrespect and it's a challenge for gang members."

Officer Zuniga further testified that on the day of the shooting at issue here, three criminal street gang members were shot and killed, including Lopez, the victim here. Lopez was the day's second victim. Such shootings usually precipitated retaliatory shootings, and indeed the day's first victim was a Sureño, Lopez was a Norteño, and the third victim was a Sureño. Asked about the shooting of Lopez, Officer Zuniga opined that the crime would have been committed for the benefit of, at the direction of, or in association with a Sureño street gang because it could be aimed at a perceived rival gang member.

## DISCUSSION

I. *Instructing That Defendants' Gang Activities Were Evidence That They Committed These Crimes (Carrillo and Rivas)*

Both defendants claim[2] that the trial court infringed on their right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and to the effective assistance of counsel under the Sixth and Fourteenth Amendments thereof, and erred under state law, by instructing the jury that it could consider evidence of their activities with other Sureños in deciding whether they were guilty of murdering Lopez. We conclude that the trial court erred with respect to one jury instruction, but find no due process violation, denial of the right to the effective assistance of counsel, or prejudice under state law.

Defense counsel were aware of the prosecution's right to introduce evidence of Sureño activities in Salinas and defendants' involvement with the Sureños in an effort to prove the sentencing enhancement allegation that defendants committed the murder and other charged crimes to benefit a criminal street gang (Pen. Code, § 186.22, subd. (b)). At the same time, counsel were concerned that this evidence not be used improperly as character evidence to prove that defendants committed the murder and the other charged crimes. They raised their concern in pretrial proceedings. Although

---

[2] In his opening brief on appeal, Rivas states that he joins in all claims Carrillo raises except this first claim, which each defendant presents separately. One of Carrillo's claims, however, contains a factual basis that applies only to him. (*Post*, pp. 1425–1431.) Other claims may apply more clearly to both defendants, but to the extent that only Carrillo or Rivas presents substantive arguments in support of them, we identify them as coming from that defendant without discounting their application to the other defendant.

the prosecution had filed a pretrial motion that gang activity evidence should be admitted to show that defendants committed the charged crimes, during the hearing on the motion the prosecutor and the trial court agreed that defense counsels' concern was valid. Everyone agreed that the evidence could be considered only for limited purposes, and not as bearing on defendants' guilt of the charged crimes. For example, the prosecutor stated, during the parties' discussion of pretrial motions, that the gang evidence "goes to support the [defendants'] identity [as Sureños], but not in terms of it being a similar pattern offense that would therefore show motive or M.O. [(modus operandi)] or something like that that would go to identity." The court ratified that understanding: "you're not offering it for the truth to argue similarity or that type of stuff," and therefore Evidence Code section "1101 is not an issue in this trial." Subdivision (b) of that statute permits evidence of prior acts to show, among other things, identity, i.e., that the prior act and the charged crimes show a distinctive "signature" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403 [27 Cal.Rptr.2d 646, 867 P.2d 757]) that ties an accused individual to the crime charged.[3]

The most similar Sureño activity was the May 2006 shooting from a vehicle in which Carrillo was involved. We have described the testimony about it in our factual summary. (*Ante*, p. 1419.) The prosecutor confirmed during pretrial discussions that this May 2006 episode "is not offered pursuant to 1101-B," i.e., Evidence Code section 1101, subdivision (b).

And yet the trial court gave an instruction that modified the pattern language of CALCRIM No. 1403 by inviting the jury to consider defendants' involvement with the Sureños in deciding whether they murdered Lopez. The People state that the record contains no explanation for the court's action. The written version of that instruction, which the court told the jury it would receive in the deliberation room, instructed: "You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements; [¶] OR [¶] The defendant had a motive to commit the crimes charged; [¶] OR [¶] *Identity*." The word identity, which we have italicized here for emphasis, was added at a location in which the pattern instruction offers the option to "insert other reason court admitted gang evidence." (CALCRIM No. 1403, italics omitted.)

---

[3] Subdivision (b) of Evidence Code section 1101 provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

The version that the trial court pronounced orally was substantially the same: "You may consider evidence of gang activity only for the limited purpose in [*sic*] deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements or whether the defendant had a motive to commit the crimes charged *or for the purpose of identity*." (Italics added.)

Defense counsel—each defendant had his own lawyer—did not object to the instruction when the trial court read it to the jury. Accordingly, the People argue on appeal that defendants have forfeited this claim. But because Penal Code section 1259 provides that a reviewing court "may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby," "claims of instructional error . . . may be asserted even without objection if they affect the defendant's substantial rights . . . ." (*People v. Seijas* (2005) 36 Cal.4th 291, 302 [30 Cal.Rptr.3d 493, 114 P.3d 742].) There is no question that the court's action affected defendants' substantial rights, so we shall consider their claim on the merits.

■ The trial court's placement of the word "identity" at the end of the instruction made it at best ambiguous, and at worst told the jury that it could consider the May 2006 shooting incident as evidence that defendants, particularly Carrillo, had a modus operandi of participating in shootings from vehicles. Certainly the court erred under state law by shaping the litigation as it did and then inviting the jury to consider evidence of Sureño activity to establish defendants' identities as the perpetrators of the murder of Lopez and the other charged crimes.

Under state law, however, we find no prejudice, i.e., we find no reasonable probability exists that absent the error the outcome would have been more favorable to defendants. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Eyewitnesses identified both defendants as the minivan occupants. Eyewitness testimony is known to be not necessarily reliable, and questions about Carrillo's goatee, the color of the minivan, and the seating position of each defendant are reminders of its limitations. Nevertheless, one eyewitness testified that he was certain that Rivas was the passenger, another testified that she was certain that Rivas and Carrillo occupied the minivan, although she transposed their positions during her testimony, and a third told police he was sure Carrillo was the driver and gave them a detailed description of him, including such details as his wearing brown gloves. One eyewitness was sure that the Carrillo family minivan was used in the shooting and two others thought it might have been. Defendants exchanged cell phone calls throughout the day except for about 10 minutes before the shooting to about two and a half hours after, suggesting they were together when the

shooting occurred. And Rivas created a false alibi involving his grandfather. Under these circumstances, the jury instruction error was not prejudicial. (Cf. *People v. Foster* (2010) 50 Cal.4th 1301, 1332–1335 [117 Cal.Rptr.3d 658, 242 P.3d 105] (*Foster*) [reaching the same conclusion in addressing at length a similar identity-based claim].)

■ As for defendants' due process claim, "fundamental fairness [is] the touchstone of due process . . ." (*Gagnon v. Scarpelli* (1973) 411 U.S. 778, 790 [36 L.Ed.2d 656, 93 S.Ct. 1756]) and so a due process violation is usually established when the state proceeds in a manner that renders a trial fundamentally unfair. Thus, a "jury instruction" may " 'so infuse[ ] the trial with unfairness as to deny due process of law.' " (*Estelle v. McGuire* (1991) 502 U.S. 62, 75 [116 L.Ed.2d 385, 112 S.Ct. 475].) "The . . . question for us is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' " (*Id.* at p. 72; see *Foster, supra,* 50 Cal.4th at p. 1335.)

The error here was not minor. The trial court caused defense counsel and the prosecution to believe that the jury would not be allowed to consider Sureño activity as tending to establish defendants' identity as the perpetrators of the substantive crimes charged. It then invited the jury to consider Sureño activity for the purpose it had ruled out in pretrial proceedings. The procedure had a particular impact on Carrillo's defense, given the similarities between the May 2006 shooting incident and the one for which defendants were being tried. It is surprising that defense counsel said nothing at the time. Perhaps the court and the parties felt that every part of the instruction referred only to "the gang-related enhancements" that were the subject of the first sentence, but the jury may have understood it differently.

Various standards have been enunciated for evaluating whether, when a trial error has occurred, fundamental unfairness has resulted *and* the state of affairs requires reversal of the judgment. At times, the United States Supreme Court has equated fundamental unfairness with unreliability (*Lockhart v. Fretwell* (1993) 506 U.S. 364, 369 [122 L.Ed.2d 180, 113 S.Ct. 838] [" 'the trial was rendered unfair and the verdict rendered suspect' "]; *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 149, fn. 4 [165 L.Ed.2d 409, 126 S.Ct. 2557] [it is incorrect to say that "*only* those errors that *always* or *necessarily* render a trial fundamentally unfair and unreliable are structural . . ."]). It has equated unreliability with a reasonable probability of a different result absent the incident, as in the case of ineffective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 693, 695 [80 L.Ed.2d 674, 104 S.Ct. 2052].) At other times, it has equated fundamental unfairness with a reasonable likelihood of a different result absent the incident, as in the case of perjured testimony. (*United States v. Bagley* (1985) 473 U.S. 667, 678

[87 L.Ed.2d 481, 105 S.Ct. 3375].) Perhaps all of these iterations point to an underlying principle enunciated in *Barrientes v. Johnson* (5th Cir. 2000) 221 F.3d 741, 753: " 'A trial is fundamentally unfair if "there is a reasonable probability that the verdict might have been different had the trial been properly conducted." ' "

The reasonable likelihood and reasonable probability standards are little different. "[W]hile 'reasonable possibility' or 'reasonable likelihood . . .' . . . and 'reasonable probability' express distinct levels of confidence concerning the hypothetical effects of errors on decisionmakers' reasoning, the differences among the standards are slight. . . . [T]he gap between all three of those formulations and 'more likely than not' is greater than any differences among them." (*Strickler v. Greene* (1999) 527 U.S. 263, 300 [144 L.Ed.2d 286, 119 S.Ct. 1936] (conc. & dis. opn. of Souter, J.).)

Under these standards, we do not find the trial court's action to have resulted in fundamental unfairness requiring reversal. It is exceedingly unlikely that, had the court not acted as it did, defendants would have been acquitted. As stated, both were identified as perpetrators, and other evidence, such as the identity of the minivan and defendants' cell phone calls to each other, leave little doubt about their guilt. We find no due process violation.

There remains one further claim to be addressed. Defendants contend that reversal is required without consideration of prejudice because the "trial court . . . violate[d]" their "right to the effective assistance of counsel by actions which interfere[d] with the ability of counsel to respond to the state's case or conduct a defense." "The general rule," defendants maintain, "is that the defendant has been denied his right to effective assistance of counsel whenever a trial court's actions fundamentally interfere with the ability of counsel to contest the state's case or present a defense."

It is true that "a defendant is spared 'the need of showing probable effect upon the outcome . . . whe[n] assistance of counsel has been denied entirely or during a critical stage of the proceeding . . . the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. [Citations.] But only in "circumstances of that magnitude" do we forgo individual inquiry into whether counsel's inadequate performance undermined the reliability of the verdict.' " (*People v. Alexander* (2010) 49 Cal.4th 846, 888 [113 Cal.Rptr.3d 190, 235 P.3d 873], quoting *Mickens v. Taylor* (2002) 535 U.S. 162, 166 [152 L.Ed.2d 291, 122 S.Ct. 1237].)

The circumstances of sufficient magnitude are those "so likely to prejudice the accused that the cost of litigating their effect in a particular case"—i.e., assessing prejudice—"is unjustified. [¶] Most obvious, of course, is the

complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails"—and presumably this could occur through trial court action as well as counsel's own deficiencies—"to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." (*United States v. Cronic* (1984) 466 U.S. 648, 658–659 [80 L.Ed.2d 657, 104 S.Ct. 2039], fns. omitted; see *People v. Hernandez* (2012) 53 Cal.4th 1095, 1104 [139 Cal.Rptr.3d 606, 273 P.3d 1113] [collecting cases].)

This is not a case of either of the foregoing types. Defendants were afforded counsel, and counsel did not absent themselves from the courtroom or otherwise entirely fail to offer assistance. The exceptional circumstances that may lead to reversal on ineffective assistance of counsel grounds without regard to prejudice have been summarized by our Supreme Court: "A defendant claiming counsel failed or was unable to subject the prosecution's case to meaningful adversarial testing is relieved from the burden of showing prejudice only if ' "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." ' [Citation.] Prejudice must be shown if counsel has opposed the prosecution throughout the relevant proceeding, even if counsel failed or was unable to do so at specific points." (*People v. Hernandez, supra,* 53 Cal.4th at p. 1106, italics omitted.)

In addition, *Cronic* observed that "[c]ircumstances of that magnitude may [also] be present on some occasions when[,] although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." (*United States v. Cronic, supra,* 466 U.S. at pp. 659–660.)

This case is not on par with that scenario either. This was simply an instructional error by the trial court and defense counsel were present to try to correct it. They failed to do so. This is not a case in which the court barred counsel from the courtroom, interfered with their ability to confer with their clients (cf. *Geders v. United States* (1976) 425 U.S. 80, 82–83 [47 L.Ed.2d 592, 96 S.Ct. 1330] [trial court ordered defendant not to consult with counsel during a recess between counsel's direct and cross-examinations]), directed them to sit mute at the counsel table (cf. *Herring v. New York* (1975) 422 U.S. 853, 853–854, 856, 859, 865 [45 L.Ed.2d 593, 95 S.Ct. 2550] [order denying counsel opportunity to summarize at close of bench trial denied defendant assistance of counsel]), issued an order out of pique or whim directing counsel to stop representing their clients, or anything similarly serious. Nor is this a case involving a claim of instructional error in which defense counsel

was absent from the courtroom when a trial court gave an arguably faulty instruction (*French v. Jones* (6th Cir. 2003) 332 F.3d 430, 438 [the defendant's "attorneys did not have an opportunity to respond to the jury's note nor were they present when the trial judge gave the supplemental instruction"]; see *id.* at pp. 432, 438–439). Those were cases in which "the nature of the imposition on the right to counsel made it difficult to assess its effect on the outcome of the trial . . . ." (*People v. Hernandez, supra,* 53 Cal.4th at p. 1107.) This is not such a case.

Thus, defendants cannot take their claim outside the standard test for ineffective assistance of counsel. Counsel for Rivas acknowledges this possibility, urging that if we find his claim forfeited because his counsel "failed to object to CALCRIM No. 1403, as given," his failure to do so constituted ineffective assistance of counsel. The claim is not forfeited (Pen. Code, §§ 1259, 1469), but defendants' prejudice-based ineffective assistance of counsel claim (*Strickland v. Washington, supra,* 466 U.S. 668) requires a response.

■ Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the effective assistance of counsel. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].) "The ultimate purpose of this right is to protect the defendant's fundamental right to a trial that is both fair in its conduct and reliable in its result." (*Ibid.*) A claim of ineffective assistance of counsel in violation of the Sixth Amendment entails deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of an adverse effect on the outcome. (*Strickland v. Washington, supra,* 466 U.S. at pp. 687–688, 694.) The *Strickland* standards also apply to defendant's claim under article I, section 15 of the California Constitution. (E.g., *People v. Waidla* (2000) 22 Cal.4th 690, 718 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

As stated, it is most unlikely that defendants would have been acquitted if defense counsel had acted to correct the faulty instruction and succeeded in doing so. Both were identified as perpetrators, and other evidence, such as the identity of the minivan and defendants' cell phone calls to each other, leaves little doubt about their guilt. Because counsels' inaction did not prejudice defendants, we find no ineffective assistance of counsel.

II.  *Instructing That Extrajudicial Statements Alone Proved Identity (Carrillo)*

Carrillo claims that the trial court infringed on his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution

and his right to jury trial under the Sixth Amendment thereof, and erred under state law, by giving the jury a confusing instruction, CALCRIM No. 359, that told the jury both that an accused may not be convicted by extrajudicial statements alone (i.e., the corpus delicti rule) but went on to say that Carrillo's identity as the perpetrator could be established by his extrajudicial statements alone.[4]

## A. *Background*

The extrajudicial statements at issue consisted of excerpts from phone calls Carrillo made from jail. Jail officials recorded the conversations, which were in slang Spanish interspersed with English, and a certified court interpreter translated them into English. The trial court assured itself that all jurors could read English adequately, and they read the transcript as the recorded excerpts were played in the courtroom.

Carrillo identifies the following material as relevant to his claim: Carrillo asked his interlocutors—apparently family members—if the police had found anything in the house. There was also brief discussion about the authorities' inspection of the family minivan and about a truck that Carrillo states he was in when arrested.

Carrillo's preoccupation with the police search was the most significant part of the phone call. Carrillo was worried that the police would find a contraband item in the house. On learning that they had searched the premises, Carrillo's first question was, "And they found something?" His interlocutor, Cynthia Alfaro, replied, "you're in luck because they didn't." "They didn't get that." Carrillo immediately asked, "who has it?" "They handed that over to . . . whomever it belonged to," Alfaro replied. "[T]hey didn't find" "what you were scared of," she reassured Carrillo again. She explained that once the police left, residents in the house rushed to dispose of the alarming item. Someone said, " 'Shut up and get it out of here!' "

The topic of toys came up later in this and a subsequent conversation. First, Carrillo and his mother, Martina Carrillo, spoke, and Martina said, "[t]he little toys that you have, that's not, not okay." A week later, Carrillo

---

[4] When quoting an instruction in this decision, we quote only the written version unless it is particularly important to note any differences between the written and orally pronounced versions. The trial court stated that it would give the jury copies of the written instructions for use during deliberations and the record offers no reason to doubt that it did so. In these circumstances (*People v. Wilson* (2008) 44 Cal.4th 758, 802 [80 Cal.Rptr.3d 211, 187 P.3d 1041]) "[t]o the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control." (*Id.* at p. 803; accord, *id.* at p. 804.)

and a person named Rico (whose last name was unknown to the authorities) discussed the disposition of this toy:

"[Carrillo]: . . . The . . . little toy from Toys 'R Us that they bought from . . . Jamie . . . that was in Cuata's room, . . . they already delivered it to the store, right?

"[Rico]: The what?

"[Carrillo]: You do know about the . . . little toy from Toys 'R Us that was in Cuata's room?

"[Rico]: Oh, yeah. Yeah.

"[Carrillo]: There's nothing . . . there, right? They . . . took it back?

"[Rico]: Yes, bro'."

The prosecutor suggested at closing argument that Carrillo was making a coded reference to a gun that he had hidden in the house, a gun that belonged to the Sureños collectively and would be passed around among gang members. Defense counsel countered at closing argument that if they were talking about a gun, it was not the gun used in the crimes.

## B. *Claim of Instructional Error*

Carrillo contends that CALCRIM No. 359 is confusing and internally contradictory and gives a false impression of the law. On the one hand, as provided to the jurors, it informed them, "A defendant may not be convicted of any crime based on his out-of-court statements alone. You may only rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crimes were committed." On the other hand, it also told them, "The identity of the person who committed the crimes and the degree of the crimes may be proved by the defendant's statements alone." How, Carrillo asks, can his extrajudicial statements, taken alone, prove his identity, which is inseparable from his perpetration of a crime, when the same statements, taken alone, also bar his conviction of that crime? He also argues that by highlighting extrajudicial statements as a permissible sole basis to identify him as the perpetrator, the trial court gave a constitutionally defective pinpoint instruction in the prosecution's favor. (See *Cool v. United States* (1972) 409 U.S. 100, 103, fn. 4 [34 L.Ed.2d 335, 93 S.Ct. 354] (*per curiam*).)

We agree that CALCRIM No. 359 is deficient to the extent it lends itself to an interpretation that criminal defendants could be convicted on the basis of

extrajudicial statements alone that they committed a crime. But we find no infringement of Carrillo's constitutional rights or prejudicial state law error. Accordingly, Carrillo's challenge fails.

█    The CALCRIM No. 359 pattern instruction contains four paragraphs.[5] The first two correctly express the corpus delicti rule. Under this rule, "every conviction must be supported by some proof of the corpus delicti . . ."—i.e., that someone committed a crime[6]—"aside from or in addition to [a defendant's inculpatory extrajudicial] statements, and . . . the jury must be so instructed." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1165 [119 Cal.Rptr.2d 903, 46 P.3d 372], italics omitted (*Alvarez*).) This applies to each element of a crime, i.e., " 'defendant cannot be convicted of a crime unless there is proof as to each element of the offense independent of his extrajudicial confession or admission.' " (*Foster, supra,* 50 Cal.4th at p. 1345.)

Thus, and to provide more detail, the corpus delicti rule requires that a conviction be supported by some evidence, which need only constitute " 'a slight or prima facie showing' " (*Alvarez, supra,* 27 Cal.4th at p. 1181), but must be in addition to and beyond the defendant's untested inculpatory extrajudicial statements (*id.* at p. 1169), that "*someone* committed a crime." (*People v. Jones, supra,* 17 Cal.4th at p. 319 (conc. opn. of Mosk, J.).) That person need not be the accused; it could be anyone. For that reason, "[p]roof of the corpus delicti does not require identity of the perpetrators. It is not necessary that it connect the defendant with the commission of the crime although it may do so." (*People v. Cullen* (1951) 37 Cal.2d 614, 624 [234 P.2d 1].)[7]

---

[5] The language of the CALCRIM No. 359 pattern instruction is as follows:

"The defendant may not be convicted of any crime based on (his/her) out-of-court statement[s] alone. You may only rely on the defendant's out-of-court statements to convict (him/her) if you conclude that other evidence shows that the charged crime [or a lesser included offense] was committed.

"That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.

"The identity of the person who committed the crime [and the degree of the crime] may be proved by the defendant's statement[s] alone.

"You may not convict the defendant unless the People have proved (his/her) guilt beyond a reasonable doubt."

[6] *People v. Jones* (1998) 17 Cal.4th 279, 320 [70 Cal.Rptr.2d 793, 949 P.2d 890] (conc. opn. of Mosk, J.); *People v. Cobb* (1955) 45 Cal.2d 158, 161 [287 P.2d 752].

[7] The rule is venerable. It is based on ancient cases in which people were tried for murder, convicted, and executed despite the absence of a dead body, only to have the purported victim reappear. (*People v. Jones, supra,* 17 Cal.4th at p. 322 (conc. opn. of Mosk, J.).) Nowadays, its chief utility may be in ameliorating, to howsoever slight an extent, the pernicious effects of jailhouse informants' false accusatory statements. (*Id.* at p. 323 (conc. opn. of Mosk, J.).) The rule is meant "to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened." (*Alvarez, supra,* 27 Cal.4th at p. 1169.)

*Alvarez* explained that "once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues." (*Alvarez, supra*, 27 Cal.4th at p. 1171; accord, *id.* at p. 1181.) Plainly, that would include identity where it is at issue. But the reference to identity in CALCRIM No. 359 presents a risk of confounding the jury by telling jurors that a defendant's inculpatory extrajudicial statements, taken alone, do not suffice to allow the jury to convict the defendant of a charged crime—and yet those statements, again taken alone, are entertainable to prove the defendant's "identity [as] the person who committed the crime" (CALCRIM No. 359, 3d par.), which to any juror can only mean the defendant's identity as the perpetrator, i.e., the guilty party. The instruction requires reconsideration.[8]

▮ Nevertheless, we find no due process violation or violation of Carrillo's right to jury trial under the United States Constitution. Regarding due process—and we think the same standard applies to the Sixth Amendment's jury-trial guaranty, since both guaranties, as far as trial error is concerned, ultimately are meant to ensure a reliable verdict—"not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is ' "whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." ' [Citation.] ' "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." ' " (*Middleton v. McNeil* (2004) 541 U.S. 433, 437 [158 L.Ed.2d 701, 124 S.Ct. 1830].)[9]

The jury was told more than once that it could find Carrillo guilty of the charged crimes only if convinced beyond a reasonable doubt that he committed them. CALCRIM No. 359 itself stated this. The court also instructed with

---

[8] We are not here concerned with CALJIC No. 2.72, whose validity was upheld in *Foster, supra*, 50 Cal.4th at page 1345. The wording of CALJIC No. 2.72 is quite different; the version considered in *Foster* provided: " 'No person may be convicted of a criminal offense unless there is some proof of each element of the crime independent of any admission made by him outside of this trial. [¶] The identity of the person who is alleged to have committed a crime is not an element of the crime nor is the degree of the crime. Such identity or degree of the crime may be established by an admission.' " (*Foster, supra*, at pp. 1344–1345, fn. 19, italics omitted.) CALJIC No. 2.72 explains the role of identity satisfactorily, i.e., that an individual's identity is not an element of a crime (*Foster, supra*, at p. 1345), but CALCRIM No. 359 does not. As Carrillo argues in a supplemental letter brief this court requested, "It may well be that in the third paragraph of CALCRIM [No.] 359 the drafters intended simply to convey the idea that identity is not part of the corpus delicti rule which requires corroboration. But they did so in a most unfortunate way."

[9] In addition, "If the charge as a whole is ambiguous, the question is whether there is a ' "reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*Middleton v. McNeil, supra*, 541 U.S. at p. 437.) But we are not presented with that situation and need not address the reasonable likelihood standard.

CALCRIM No. 220, which informed the jury that it must consider all the evidence and find Carrillo not guilty unless the prosecution proved him guilty beyond a reasonable doubt. Because other evidence strongly pointed to Carrillo's guilt, the error in giving CALCRIM No. 359 did not so badly infect the entire trial that reversal is required.[10] Similarly, under the state law prejudice standard of *People v. Watson, supra,* 46 Cal.2d at page 836, there is no reasonable probability that, absent the error, the outcome would have been more favorable to Carrillo.

Anticipating this conclusion regarding federal constitutional violations and prejudice under state law, Carrillo contends that CALCRIM No. 359 told the jury in effect that his extrajudicial statements alone could supply a sufficient quantum of evidence to convict him. But that is just the point: at most, the jury may have understood that Carrillo's inculpatory extrajudicial statements *could* justify convicting him—"identity . . . *may* be proved by the defendant's statements alone." (CALCRIM No. 359, italics added.) It is not likely that the jury relied significantly on his statements in reaching the verdicts. As described, they consisted of references to searches of the family home, minivan, and truck, and to a mysterious item, referred to in coded language as a toy, that could have been a gun. But Rivas, not Carrillo, was the shooter. And as defense counsel argued to the jury, the telephone conversation did not suggest that any gun in the house was the gun used to kill Lopez. As a committed Sureño living in a town experiencing Norteño-Sureño strife, Carrillo could have had a gun for any number of reasons. The other evidence against him was more important—we need not repeat it in detail here. If it was not already obvious, the trial court instructed the jury to "decide how much importance to give to the statements." For the foregoing reasons, Carrillo's challenge fails.

Carrillo, invoking state law and the federal due process clause, makes two other claims regarding the foregoing instructional language. They too are

---

[10] We look to the effect of the error on *this* jury, not some hypothetical jury, to assure ourselves that the verdict rendered in defendant's case is surely unattributable to the error in instructing with CALCRIM No. 359. This is the standard of review followed when reviewing for prejudice under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], following a finding of federal constitutional error. "The State bears the burden of proving that an error passes muster under [the *Chapman*] standard" of prejudice. (*Brecht v. Abrahamson* (1993) 507 U.S. 619, 630 [123 L.Ed.2d 353, 113 S.Ct. 1710].) Under *Chapman,* the state must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" (*Chapman v. California, supra,* 386 U.S. at p. 24). " 'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is 'whether the . . . verdict actually rendered in *this* trial was surely unattributable to the error.' " (*People v. Neal* (2003) 31 Cal.4th 63, 86 [1 Cal.Rptr.3d 650, 72 P.3d 280].)

unavailing. First, Carrillo argues that the objectionable language failed to instruct the jury that it had to prove his identity as the killer beyond a reasonable doubt. But identity is not an element of a crime for corpus delicti purposes (*Foster, supra*, 50 Cal.4th at p. 1345) and, as explained, the jury was told not to return any convictions that were not supported to its satisfaction by proof beyond a reasonable doubt. He also argues that the objectionable language instructed that his extrajudicial statements could be used only against him, not in his favor, a situation worsened by CALCRIM No. 305, which as applied told the jury, "You have also heard evidence that defendant Carrillo made a statement out of court and before trial. You may consider that evidence only against him, not against any other defendant." But the corpus delicti rule applies to inculpatory extrajudicial statements such as confessions (*Foster, supra*, 50 Cal.4th at p. 1345; *People v. Cobb, supra*, 45 Cal.2d at p. 161) and admissions (*Foster, supra*, at p. 1345), not to exculpatory statements, so both instructions—CALCRIM Nos. 305 and 359—were proper restatements of the law in this respect. (But see *Cool v. United States, supra*, 409 U.S. at p. 103, fn. 4.)

### III. *Failing to Instruct on Natural and Probable Consequences (Carrillo)*

Carrillo claims that the trial court infringed on his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and erred under state law by introducing an allusion to unintended but foreseeable crimes and failing to narrow that allusion by instructing the jury with CALCRIM No. 403, which would have explained the natural and probable consequences theory of accomplice liability to the jury.

The natural and probable consequences route to a finding of criminal liability operates as follows: " 'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor actually foresaw the additional crime, but whether, judged objectively, it was reasonably foreseeable. [Citation.]' [Citation.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' " (*People v. Medina* (2009) 46 Cal.4th 913, 920 [95 Cal.Rptr.3d 202, 209 P.3d 105], italics omitted.) In short, natural and probable consequences liability for crimes occurs when the accused did not necessarily intend for the ultimate offense to occur but was at least negligent (from the standard expected of a

reasonable person in the accused's position) about the possibility that committing the proximate offense would precipitate the ultimate offense that actually occurred.

The instruction of which Carrillo complains, CALCRIM No. 400, touched abstractly and preliminarily on this route to criminal liability. It recited: "Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."

The note to the instruction cautions that this language should be given to the jury only if "[t]he prosecution is also relying on the natural and probable consequences doctrine . . . ." (Judicial Council of Cal., Crim. Jury Instns. (2012) Bench Notes to CALCRIM No. 400, p. 167.) But the prosecution did not rely on that theory, making the instruction superfluous.

Carrillo asserts that ordinarily this abstract reference to "some specific circumstances" would be elaborated upon by CALCRIM No. 403, which explains the natural and probable consequences doctrine. Although the instruction's pattern language offers so many options that it would be difficult to quote, an example of how CALCRIM No. 403 has been given to a jury is found in *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1450 [105 Cal.Rptr.3d 575]: "The jury was instructed that, to convict defendant of second degree murder or voluntary manslaughter under the natural and probable consequences doctrine, it would have to find that (1) 'defendant knowingly and intentionally aided and abetted an assault with a deadly weapon'; (2) 'a co-participant in that offense committed the crime of murder or voluntary manslaughter'; and (3) '[u]nder all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder or voluntary manslaughter was a natural and probable consequence of the commission of an assault with a deadly weapon.' "

But as stated, the trial court did not give CALCRIM No. 403. From this, Carrillo draws the conclusion that the jury was invited to create avenues on its own, beyond those on which it was instructed elsewhere, to find him guilty of the crimes of which it convicted him.

Our Supreme Court has observed that when the parties make "no reference to the 'natural and probable consequences' doctrine in their arguments to the jury, it is highly unlikely that the jury [will have] relied on that rule . . . ." (*People v. Prettyman* (1996) 14 Cal.4th 248, 273 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) The prosecutor here made no such reference. The prosecutor argued that defendants "were the ones in the van who killed James Lopez, tried to kill Ricardo and shot into that vehicle." She went on to say, "[y]ou may be

thinking, well, we heard evidence that Mr. Rivas fired this gun and did these things[;] what about Mr. Carrillo[?]" She stated that the prosecution believed Carrillo aided and abetted Rivas's actions. "Someone aids and abets," she explained, "if they know the person['s] unlawful purpose, and you . . . intend to help them and you do help them." The prosecutor's theory was that "Mr. Carrillo knew that Mr. Rivas intended to commit the crime, that before or after the commission of the crime, Mr. Carrillo intended to aid and abet Mr. Rivas in committing the crime and that his words or conduct did in fact aid and abet Mr. Rivas's commission of this crime." Among other things, she argued, Carrillo's driving the van in a speeding manner was predatory, allowing defendants to confront Lopez and Ricardo E.; Carrillo and Rivas had spoken to each other beforehand; Carrillo helped Rivas flee; and a gang war was underway that day. "These two were acting in concert . . . , acting as a unit, which is what fellow gang members do for one another," she concluded. "One could not have committed the crime without the other." "Defendants . . . are both active Sureño gang members, working together, in association, in concert to commit this crime." The prosecutor could hardly have been clearer that defendants both intended to kill. At no point during closing argument, or in her opening statement, did she argue that Carrillo was responsible for the shooting on a theory that he did not necessarily intend for it to happen but its occurrence was a natural and probable consequence of the events of that day.

Thus, here as in *People v. Prettyman, supra*, 14 Cal.4th at page 273, "it appears that the jury was persuaded by the prosecutor's argument that [the defendant] encouraged or assisted [his] codefendant . . . to murder . . . , and thus was guilty of murder as an accomplice to that crime, not as an accomplice to some other unlawful act of which the murder was a natural and probable consequence."

Carrillo urges us not to rely excessively on *People v. Prettyman, supra*, 14 Cal.4th 248; he notes that it involved a different claim, one of error in failing to instruct on the proximate offense, and seeks to distinguish the record in this case from the circumstances of that one. But *Prettyman* makes the People's larger point: the lack of prosecution argument on natural and probable consequences left meaningless the instructional language Carrillo objects to.

Under *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 183–184 [112 Cal.Rptr.3d 746, 235 P.3d 62] (*Letner*), giving the language in CALCRIM No. 400 was error; it was superfluous and, without clarification through CALCRIM No. 403, meaningless. But as in *Letner*, "[t]he prosecutor . . . , contrary to defendants' assertions, did not rely upon the natural-and-probable-consequences doctrine; rather, she repeatedly argued [that] the evidence

established that both defendants intended to commit all of the charged crimes, and both intended to kill . . . ." (*Letner, supra*, at pp. 183–184.) Thus, as in *Letner*, which apparently addressed both constitutional and state law claims, "we conclude the error was harmless, because there is no reasonable likelihood the jury misunderstood or misapplied the law. To point out, as defendants do, that the ambiguous instruction *could* have led the jury to ' "indulge in unguided speculation" ' [citation] concerning the unspecified target offenses . . . does not establish a reasonable likelihood that the jury did so. As mentioned above, the prosecutor did not rely upon the natural-and-probable-consequences doctrine, but argued that both defendants intended to commit all of the charged offenses." (*Letner*, at p. 184; see *People v. Valdez* (2012) 55 Cal.4th 82, 152 [144 Cal.Rptr.3d 865, 281 P.3d 924].) Because the prosecutor here did not rely on the natural-and-probable-consequences doctrine, Carrillo's constitutional and state law claims are without merit.

IV.  *Allowing the Jury to Learn of Other Gang Shootings the Same Day (Rivas)*

Rivas claims that the trial court erred under state law (Evid. Code, § 352) and violated his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution by allowing the prosecution, over his objection, to introduce evidence that three gang members, including Lopez, the victim here, died in Salinas on January 12, 2009, and that they were Sureños or Norteños. The prosecution's theory of motive, as noted, was that defendants murdered Lopez, a Norteño, because earlier that day a fellow Sureño had been gunned down in Salinas.

Rivas renews the assertion he made to the trial court: the evidence was substantially more prejudicial than probative (Evid. Code, § 352). He argues that the court abused its discretion in allowing the jury to receive it. He is correct that the abuse-of-discretion standard of review applies to claims of improper admission of unduly prejudicial evidence under Evidence Code section 352. (*People v. Ayala* (2000) 24 Cal.4th 243, 282 [99 Cal.Rptr.2d 532, 6 P.3d 193].)

A trial court abuses its discretion when its ruling falls outside the bounds of reason. (*People v. Benavides* (2005) 35 Cal.4th 69, 88 [24 Cal.Rptr.3d 507, 105 P.3d 1099].) The court's ruling did not do so. The evidence was admissible to show defendants' motives for killing Lopez, i.e., as an outgrowth of gang rivalry (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1518–1519 [28 Cal.Rptr.2d 758]), and we cannot characterize as unreasonable the court's determination that its probative value outweighed the risk of prejudice under the standard set forth in Evidence Code section 352. Without some explanation to provide context, the shooting could appear meaningless—at least so the prosecution and the court could reasonably believe—and

a theory resting on a seemingly meaningless act could strike the jury as an implausible theory. Thus, there was no abuse of discretion in admitting the evidence.[11]

As for Rivas's due process claim, our rejection of his state law claim yields the answer. "[R]ejection on the merits of a claim that the trial court erred . . . necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 990, fn. 5 [47 Cal.Rptr.3d 467, 140 P.3d 775].)

V. *Allowing the Jury to Hear About Six Other Gang Crimes (Rivas)*

■ Rivas also claims that the trial court erred under state law (Evid. Code, § 352) and violated his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution by allowing the prosecution, over his objection, to introduce evidence of six so-called "predicate" gang offenses. These prior offenses were admitted to establish an element of the

---

[11] As stated *ante*, page 1418, the prosecution's gang expert, Robert Zuniga, testified that on the day defendants killed Lopez, two other criminal street gang members were shot and killed and that Lopez was the day's second victim. Rivas contends that he could not have been aware of the shooting yet to come at the time that Lopez was killed—this is, of course, indisputable as a matter of causality—and he asserts that there is no evidence he knew about the day's first killing. He argues that the prosecutor led the trial court astray by informing it that Rivas had mentioned, during police questioning, a killing that occurred after Lopez was killed, without giving the court the chronology. He also argues that the prosecutor was incorrect even about this, and that he was talking only about the Lopez shooting with police. On our reading of the transcript, we think Rivas may be correct about this, but the conversation is disjointed and at one point Rivas mentions a timeframe of about 5:30 p.m., much later in the afternoon than when Lopez was killed, so the prosecutor may have legitimately thought Rivas was talking about the later shooting.

In any event, however, Rivas overlooks the rest of the prosecutor's statement to the trial court, in which she stated that Rivas said, during his police interview, that "he's familiar with all the shootings that were going on based upon watching the news." The prosecutor informed the court that there were 16 shootings in the period—apparently about three weeks to one month—surrounding Lopez's death, many of them occurring before defendants allegedly killed Lopez and 11 of them tied, in the view of the police, to the Norteño-Sureño rivalry. Also, the court was aware that the specific shooting that the prosecutor thought she was talking about—the one she said Rivas had mentioned during questioning—had occurred after the killing of Lopez. The court did not misunderstand the alleged facts before it. The observations Rivas makes do not alter our conclusion that it did not abuse its discretion in allowing evidence of the other January 12 gang shootings to be admitted.

Rivas also argues that *People v. Funes, supra*, 23 Cal.App.4th 1506, is factually distinguishable in that the case contained evidence of the perpetrator's direct statements that his gang would retaliate against a rival gang. This description of *Funes* is accurate. (*Id.* at p. 1512.) Nevertheless, the lack of any evidence of such direct statements here does not, contrary to Rivas's argument, make *Funes* "not analogous." There was ample circumstantial evidence that Rivas and Carrillo had a motive to retaliate similar to that held by *Funes*.

gang-benefit sentencing enhancement (Pen. Code, § 186.22, subd. (b)), which provides additional punishment for a person who "actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang . . ." (*id.*, subd. (a)).

Subdivision (e) of Penal Code section 186.22 permits a true finding on the sentencing enhancement allegation only if the prosecution can show at least two listed events to establish a pattern of gang activity: " 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses[, which are listed in the provision], provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons . . . ."

The trial court did not abuse its discretion in allowing the prosecution to introduce this evidence. As the People observe, *People v. Hill* (2011) 191 Cal.App.4th 1104, 1137–1139 [120 Cal.Rptr.3d 251], approved the introduction of eight predicate offenses to establish the gang-benefit allegation. Conversely, one reviewing court found marginal evidence bearing on this allegation to be insufficient to establish its truth (*People v. Perez* (2004) 118 Cal.App.4th 151, 159–160 [12 Cal.Rptr.3d 821]; see *People v. Vy* (2004) 122 Cal.App.4th 1209, 1226, fn. 12 [19 Cal.Rptr.3d 402]), which could have made the prosecution leery of introducing too little evidence about predicate crimes. The statute speaks of a "pattern" and permits the prosecution to introduce evidence of "two or more" offenses. (Pen. Code, § 186.22, subd. (e).) There was no abuse of discretion, and we also reject Rivas's due process claim for the same reasons it was rejected in part IV. (*People v. Lewis and Oliver, supra,* 39 Cal.4th at p. 990, fn. 5).

### VI. *Cumulative Error (Carrillo and Rivas)*

Defendants claim that their due process rights to a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution were violated because of the cumulative effect of the trial court's errors.

A claim of cumulative error is in essence a due process claim and is often presented as such (see, e.g., *People v. Rogers* (2006) 39 Cal.4th 826, 911 [48 Cal.Rptr.3d 1, 141 P.3d 135]). "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795 [118 Cal.Rptr.2d 668].)

Taking all of defendants' claims into account, we are satisfied that they received a fair adjudication. Defendants were "entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009 [108 Cal.Rptr.2d 291, 25 P.3d 519].) This trial was fair beyond any doubt, although instructional error did occur. We deny defendants' claims.

## DISPOSITION

The judgments are affirmed.

Premo, Acting P. J., and Mihara, J., concurred.

Appellants' petitions for review by the Supreme Court were denied July 17, 2013, S210346.