Filed 10/25/13  P. v. Canada CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B240133 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA078467) |
| v. | |
| DEJON XAVIER CANADA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathryn A. Solorzano, Judge.  Affirmed.

Lisa M. Bassis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, Michael Katz, Deputy Attorney General, for Plaintiff and Respondent.

————————————————

A jury convicted Dejon Xavier Canada of possession of a firearm by a felon. Canada argues that the discharge of a juror violated his Sixth Amendment rights, challenges a witness's identification testimony, and claims instructional error. We affirm.

## BACKGROUND

A second amended information alleged that Canada committed assault with a semiautomatic firearm on Roberto Villanueva in violation of Penal Code[1] section 245, subdivision (b) (count 1) with a personal use enhancement. The information further alleged that Canada was a felon in possession of a firearm, in violation of section 12021, subdivision (a)(1) (count 2). As to both counts, the information alleged that Canada had seven prior felony convictions under section 1203, subdivision (e)(4), for which he served prison terms pursuant to section 667.5, subdivision (b).

At trial, Paola Padilla testified that on the evening of August 16, 2011, she was at home in Hawthorne with her mother and her mother's boyfriend, Roberto Villanueva. At 8:00 p.m. Padilla left the apartment to buy milk and walked to her car in the carport area. She noticed that another car was blocking the rear of her car, with four black men sitting inside. As Padilla opened her car door, she saw Canada standing next to the passenger side, urinating. Padilla thought Canada was connected to the four men in the car, and she asked him: "'Is that your car?'" He responded: "'Who the fuck are you talking to?'" He appeared to be grabbing for something under the bottom of his shirt. Padilla said, "'There is no need for you to talk to me that way. I'm just asking a question,'" but noticing the aggressive tone of Canada's voice, she closed her car door and ran inside. The other car moved away.

Padilla told Villanueva what had happened, and he went to the apartment window overlooking the parking lot. Villanueva opened the blinds, and Padilla saw a shadow approach and heard Villanueva say, "'He has a gun.'" She ran upstairs and called 911.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

Padilla spoke to the 911 operator, and the tape was played at trial. She told the operator that a black man was "right behind [the apartment] in the parking lot, knocking on our window with a gun" and "pointing [it] at the window." She said that she had seen the man and the gun although she had not, "basically speaking for everyone." She told the 911 operator that the man's shirt was white because she "was in a rush to get them there, and [she] wasn't really thinking straight," although she now remembered that he was wearing dark clothing. She also told the operator that the man had a bandanna on his head.

The police arrived, and ran off on a call. Padilla heard them say, "'We got him'" and heard gunshots. Five minutes later, they took Padilla in a police car to identify the suspect. She was told that she would be shown a few people who "were going to be blinded by the cop car lights," and if she saw the suspect she should say yes, if she did not, she should say no, and if she wasn't sure she should say nothing. Canada was one of the two men she was shown. The other man was a neighbor. Padilla told the police that she was not sure Canada was the suspect, as he "could have been one of the other individuals who [Padilla] saw near the car." After the police left, Villanueva told Padilla that he had made an identification at the field showup when he was asked to look at Canada.

The next day, Padilla picked Canada out of a six-pack photographic lineup. At the time she did not know whom Villanueva had identified earlier. Although it was "recommended" that Padilla wear glasses, she did not wear them all the time because they made her dizzy. She was not wearing any during her testimony, and she was not wearing glasses the night of the incident and the field showup.[2] She was about five feet away when she saw Canada by her car, and during the minute that she interacted with him Padilla noticed that he had a white spot in his beard on his chin, and was wearing dark clothes and a bandanna covering his hair. She never saw him holding a gun.

---

[2] No testimony addressed whether Padilla was wearing glasses when she viewed the photo lineup.

Villanueva testified that on August 16, 2011 he was at home with Padilla and her mother, and Padilla left at 8:00 p.m. to get some milk. A few minutes later Padilla came back inside, looking scared and saying, "A black guy was outside and . . . told her bad words." Villanueva went to the window facing the carport area, raised the blinds and opened the window. At first he saw no one, but then suddenly Canada popped up right outside the window, bearded and wearing a black shirt and a do-rag. Canada said, "'Don't fuck with me, mother fucker,'" pulling out a black gun and pointing it at Villanueva. The gun was not a revolver, and looked like People's exhibit 8, the gun recovered from the scene. Villanueva backed away from the window as Canada ran away. He told the others that Canada had a gun, and they ran upstairs; he heard Padilla talking while she called 911.

The police arrived, and while Villanueva was talking to them outside, he heard gunshots and the police ran off. Ten or 15 minutes later, "[a]fter they caught him," the police took Villanueva (separate from Padilla) in a squad car to a field showup. Canada was brought to the location, where the police asked Villanueva, "'Is this the guy or not,'" and Villanueva said yes. Villanueva also identified Canada in court a few weeks later.

Hawthorne Police Officer Derrick Cabrera testified that he responded to the scene, where he saw Canada, dressed all in black, in the carport crouched in front of a parked car. When Canada saw Officer Cabrera, he crouched down behind the car, and as he and another officer approached, Canada fled and the officers pursued him. A gun was later found in front of the car where Canada was crouched down.

Hawthorne Police Officer Virginia Iler testified that she drove to the scene with her partner Officer Cabrera. Officer Iler saw Canada alternately running and crouching down in the carport area near the driveway. The officers ran after Canada, and Officer Iler heard a gunshot, which she later learned was from another officer firing a rubber bullet from a shotgun. Canada was taken into custody.

Officer Iler returned to the carport with Officer Cabrera and another officer with a police dog, which alerted to a gun near a bumper of one of the cars near the entry of the carport. The gun was a loaded black and silver semiautomatic pistol, the same gun

4

(People's exhibit 8) shown to Villanueva. No fingerprints were obtained from the gun. DNA tests produced inconclusive results.

Hawthorne Police Officer Wilbert Pereira met with Villanueva after Canada was taken into custody. Officer Pereira took Villanueva to a field showup, and from the rear seat of the squad car Villanueva identified Canada (standing 15–20 feet away from the car, whose lights were on) as the man who had pointed the gun at him. The officers transported Canada to the hospital for treatment of his abrasion from the rubber bullet. Officer Pereira noticed that Canada had a patch of white hair in his beard.

Hawthorne Police Detective Ryan Driessen testified that the day after the incident, he and another detective went to Padilla's apartment to show her a six-pack photographic lineup. Padilla circled a photograph of Canada, and signed the lineup. Detective Driessen did not know that Padilla had identified Canada in the field showup the night before.

The defense presented Mitchell Eisen, Ph.D., an expert witness who testified that traumatic stress could prevent an individual from recalling the details of the event as well as he or she normally would. The presence of a weapon could impact a person's ability to accurately make identifications. Postevent information that the person did not actually perceive could begin to merge with the actual memory of the event. It was also harder for a person to identify an individual from another racial group. Further, false identifications were more common in field showups with only one suspect. Once a field identification had been made, a carryover effect could make it more likely that the person would identify the same individual in a photo lineup the next day. The general trend is that a person making an identification would become more certain over time.

The jury was unable to reach a verdict on count 1 (assault with a semiautomatic firearm on Villanueva), and the trial court declared a mistrial and later granted the prosecutor's motion to dismiss that charge under section 1385. The jury convicted Canada on count 2, possession of a firearm by a felon. Canada admitted that he had five prior felony convictions for each of which he served a separate prison term. The trial

court sentenced Canada to eight years in state prison.  Canada filed a timely notice of appeal.

## DISCUSSION

**I.**      **The trial court did not abuse its discretion in dismissing a juror for concealing his bias against the Hawthorne Police Department.**

During the jury's deliberations, the trial court discharged a juror and replaced him with an alternate juror, giving as the reason that the juror committed misconduct by failing to disclose his bias against the Hawthorne Police Department.  Canada argues that the discharge of the juror was without good cause, and violated his rights under the Sixth and Fourteenth Amendments.

### A.      Voir dire

At the beginning of jury selection, the trial court emphasized to the prospective jurors that the goal was finding fair and impartial jurors, and "to determine whether or not you are well-suited to serve on this particular case based on your past experiences."  As the jurors stood to take the oath that they would truthfully answer all the questions during voir dire, the judge added:  "The purpose of this oath—I . . . really do need you to be very honest with us and to give us full disclosure with regard to any of the questions that we ask."

During the court's statements to the prospective jurors, the court explained that it was looking for each juror "to be committed to being fair" to both the prosecution and the defense, as the jury had to make "an objective rational decision based on facts, not a subjective decision based on some kind of emotion or some kind of agenda that we're not aware of."

The court told the prospective jurors that the clerk would give them a questionnaire for them to hold until the selection process was complete, and asked the prospective jurors to read all the questions and check whether they had any "'yes'"

6

answers, or any comments. The questionnaire was marked court's exhibit A.[3] Among the questions were the following: "Do you or any relative or any close friends have a present or past connection with law enforcement or a public law office?" (question 6); "Have you or a relative or close friend ever had a bad experience with a police officer or an unusually good experience with a police officer?" (question 8); and "Do you think you would automatically weigh the testimony of a police officer differently, in comparison to any other witness? In other words, would you automatically find the testimony credible or less credible simply because the witness is a police officer or would you evaluate the police officer's testimony the same as you would any other witness's testimony?" (question 9).

The court read to the prospective jurors the names of the witnesses, identifying the police officers as "law enforcement officers with the Hawthorne P.D." In response to a prospective juror's question (not the juror at issue here), the court explained: "I just need to ask you in advance if you have any particular attitude toward anybody that's associated with this case. [¶] You will likely hear from a law enforcement officer in the case. [¶] . . . Sometimes based on what a person does people will generalize about that person . . . . [¶] . . . [¶] I don't want you to generalize about people based on what they do." The court further explained that it wanted the jurors to evaluate a police officer's testimony without preconceptions, and with "openness [to] all possibility and also a willingness not to generalize and stereotype."

A prospective juror (again, not the juror at issue) told the court that the Hawthorne police came to his home looking for his nephew, and although he told the police that his nephew wasn't there, they went through the house with guns drawn, and "to [him] that was very rude." Nevertheless, the juror answered that he could be fair, even if one of the

---

[3] Court's exhibit A, the juror questionnaire, was attached to respondent's brief, as was proper pursuant to California Rules of Court, rules 8.320(e) and 8.204(d), which allow a party filing a brief to attach copies of exhibits in the appellate record. We therefore deny Canada's motion to strike Respondent's brief as containing "material . . . that is not properly before the court."

police officers testified in this case, and that he could set aside his life experience and not bring it into the jury room.

Prospective juror 18, the juror at issue, stated that he wanted to discuss questions 6 and 8 (as well as three other questions not related to opinions of law enforcement). As to question 6 ("Do you or any relative or any close friends have a present or past connection with law enforcement or a public law office?"), the juror stated that he was trained as an armed security guard but no longer worked in that field. As to question 8 ("Have you or a relative or close friend ever had a bad experience with a police officer or an unusually good experience with a police officer?"), the juror stated that his wife's nephew "is LAPD," but he could be open to the possibility that an officer might testify truthfully or untruthfully. Prospective juror 18 did not raise any issues as to question 9 ("Do you think you would automatically weigh the testimony of a police officer differently, in comparison to any other witness?").

When the court completed its review of the questionnaire with the prospective jurors, it stated, "I'm assuming that you are believing that you are able to serve as a neutral arbiter of the facts here." No juror raised a hand when asked to do so if any juror had an issue with following the law and "hav[ing] an entire[] sense of neutrality towards both sides."

After the attorneys for both sides questioned individual jurors (not including the juror at issue here), the prosecutor challenged for cause the juror who had stated that Hawthorne police had gone through his home with guns drawn, looking for his nephew. The court responded that the juror had also stated he would set his experience aside and would be fair, seemed not to be "particularly outraged or stubborn," and had said he could be impartial even if one of the officers involved in the search of his home were to testify. The court denied the challenge. The prosecutor later used a peremptory challenge to request that the court excuse the juror, and the court thanked the juror and excused him. The court subsequently stated that the jurors should be open to four possibilities: "A law enforcement officer testifies and he testifies honestly, a law enforcement officer testifies and he's not honest about some things, a law enforcement

8

officer testifies and he's right about everything he testified, and a law enforcement officer testifies and he is mistaken, honestly mistaken."

Prospective juror 18 was seated as juror 1 (we call him juror 1 hereafter).

**B.     Deliberations**

Deliberations began on March 1, 2012.  The next day, March 2, the jury sent the court a note stating:  "We are unable to reach a verdict."  The court informed counsel that the jury was apparently hung, and that the court would give the jurors additional instructions.  The court brought in the jury.  The foreperson stated that the jury had voted four times.  Asked whether anyone had been talking about anything outside the evidence, the foreman responded:  "there has been some degree of speculation."  The vote was split, and additional instructions would not be helpful.  The court excused the jury and asked it to return the following Monday to resume deliberations.

That Monday, March 5, 2012, the court received a question from the jury stating: "We have a juror who is concerned about his neutrality and feels he would be benefited by a 'side-bar' with the court."  The court called in the foreperson and juror 1.  With the foreperson present, juror 1 stated:  "Now, I'm 65, and my mind—I don't recollect so good.  But after all this came about, Hawthorne policemans, I've had two incidents with Hawthorne Police.  Well, not 'incidents.'  One incident."  Juror 1 explained that in the late 1970's, he rode over to the Hawthorne Police Department with his best friend "to see about a ticket that he had had."  The police booked and handcuffed his friend, and juror 1 had to get his friend's keys and drive to his friend's apartment to get the money for bail.

Juror 1 continued that it was not an "incident," but his deceased sister-in-law "worked for Hawthorne for years.  [¶]  She's been dead about 15 years, and she used to tell us how crooked the Hawthorne Police Department was, the black officers and white officers.  [¶]  And I don't—I have this guilt in the back of my head where I'm rendering this verdict . . . ."  In response to the court's questioning, he continued:  "About 15 years ago she worked inside.  I don't know if she was discharged or what.  Family reunions you know how people talk.  [¶]  She used to say how crooked they were, some of the things that they did, and I—I had no idea this was Hawthorne Police Department when we—you

9

know after, hearing the testimonies and everything." The court asked whether juror 1 had heard the court describe witnesses as from the Hawthorne Police Department, and juror 1 said, "I had so much—I've been through so much in my time that that just doesn't—it was blank. I didn't realize it." The court asked what juror 1 would have said if he had realized it was Hawthorne, and juror 1 replied: "I would have said I had two incidents with Hawthorne Police Department, and that would have been the courts [sic] to either accept . . . or [reject] me." He would have told the court about the incidents, and if asked whether he could still be fair he would have answered: "It would be fair. I could be fair now." The court asked juror 1, "And right now as you are deliberating now, are you setting it aside right now?" and juror 1 replied, "Yes. I'm basing all my—what's presented to me." The court persisted, asking whether juror 1's evaluation of the testimony of the Hawthorne police officers was burdened in any way "by this impression that your sister-in-law left you with them being crooked," and juror 1 responded: "No, no, no."

The court emphasized that it did not want juror 1 to burden the officers' testimony with the bad impression left by juror 1's sister-in-law, "because your sister-in-law never met these law enforcement officers." Juror 1 replied that the female officer (Officer Iler) "was probably there when [his] sister-in-law was there." Even then, he would put it aside in evaluating Officer Iler's testimony. Nevertheless, juror 1 had requested the sidebar because he "wanted [the court] to know, give the prosecutor a chance to whatever" "to accept [him] or not," although juror 1 believed he was being fair. The court pointed out that the questionnaire had asked a broad question about any bad experience with law enforcement, and juror 1 explained he had been "kind of—confused."

The prosecutor and the court asked juror 1 if he had told the foreman and the other jurors "that [his] impression was that Hawthorne was crooked," and juror 1 admitted "You[r] Honor, maybe I did. Maybe I did." Juror 1 still felt he was being fair.

In response to a question by the court, the foreperson stated that juror 1 had made a statement based on some experience that came from outside the record, something like: "'I know about these things, because I've had experiences with' . . . 'a close relative.' [¶]

10

I believe he said his sister, who worked for a police department. I believe he said Hawthorne Police Department. [¶] 'And I could tell you all kind of things that she told me that they do, and that's all I'm going to say.'" The foreperson answered a question by the prosecutor by saying that he used the word "neutrality" in his note to the court because he "decided that [juror 1] had expressed to [him] a concern about his ability to be fair and truthful in deciding the facts."

The court gave the jury a 20-minute break. Defense counsel urged the court not to excuse the juror. The prosecutor argued that juror 1's failure to disclose the information was significant because during voir dire, the court had specifically identified the Hawthorne Police Department, and juror 1 should be replaced. The court expressed concern that juror 1 failed to disclose the information "up front" despite the court's questions during voir dire, and had been "telling the other jurors he happens to know these people are crooked."

The court stated: "[I]t's incumbent upon this Court to engage in an inquiry of the rest of the 12 and to determine what, if anything, juror No. 1 has said during this process that might shed some light upon whether or not he does, in fact, have a bias against Hawthorne P.D. and whether that bias is one of the factors that he is relying on." The court made clear: "I'm not interested in knowing where he stands with regard to the evidence . . . . [¶] And then I can make a call as to what I think the situation is vis-à-vis this juror and whether or not he's biased against Hawthorne P.D. and unable to make a decision based on the evidence in this case. [¶] But I don't know—I can't make a record that will be—meet the legal standard as a demonstrable reality of misconduct unless I interview the other jurors."

The court interviewed each of the jurors individually in chronological order, asking whether during deliberations any statements had been made by anyone about something outside the evidence presented at trial. Juror 4 told the court that "someone offered an opinion based on an experience with Hawthorne Police Department," and "said they had knowledge of someone . . . who had worked for Hawthorne Police Department." "And based on that he was uncomfortable" "with the testimony of the

11

officers." Juror 5 said that juror 1 had made statements about something outside the evidence: "Juror No. 1 did not have an unbiased opinion because of previous history with the Hawthorne police department." Juror 5 said juror 1 used the word "'biased" or "'unbiased,'" and that juror 1 "had a history of things that had happened to him that he knows about—he didn't really go into detail about what it was—that would make his opinions—I don't know if he said—on Friday he said it wouldn't change his opinion. And then today he conceded that it would." Juror 1 "was shaking his head," and "might have said one thing about an aunt or somebody being murdered." Juror 8 stated that juror 1 told the other jurors "that his sister-in-law or sister was a dispatcher in Hawthorne Police Department." "He said that he had an opinion as to what happens inside the police force and that, you know, there is suspicious behavior by police officers." "He said he can't be fair because he—you know, because he has these opinions." Juror 8 explained that juror 1 may not have used the word "fair," but "[h]e was just very specific about that there was a correlation between his sister-in-law in Hawthorne and his past history, and because he's a resident in that area that he has specific opinion about what goes down inside the police force." The other jurors did not report any statements by juror 1 about any matters outside the evidence.

The court called juror 1 back into the courtroom. Juror 1 stated that he began to be concerned about his sister-in-law's experience, and his failure to disclose it, when he realized that the testimony was from the Hawthorne Police Department. He felt the need to say something during deliberations. Juror 1 denied that he ever said he could not be fair, and stated: "I'm going to decide this case on the proof beyond a reasonable doubt." Juror 1 added: "I mean I really don't know—it's just—I've had problems with other police departments. I—I've had problems with Culver City. I mean I had problems before with police departments. It's just happened to be Hawthorne." In response to questions by the defense, juror 1 said he was evaluating the case only on the evidence, and had not prejudged the case before deliberations began.

With the jurors out of the room, the prosecutor argued that juror 1 should be removed and replaced. Juror 1 failed to disclose his "situation with Hawthorne P.D"

during voir dire and two days of testimony by Hawthorne police officers, and also revealed that he failed to disclose problems with other police departments, constituting "significant failures to disclose information which likely would have prohibited him from sitting on this jury." Three jurors had heard statements by juror 1 that his feelings were influencing his opinion. The defense rejoined that juror 1 had said that he was able to listen to the evidence and put his experiences aside.

The court stated that whether to remove juror 1 "is in the Court's discretion if there is a demonstrable reality with regard to his conduct in this case. [¶] . . . [¶] In this instance we have a failure to disclose information, which does suggest a bias against police officers employed by the City of Hawthorne. I don't think that anybody would say that that is not the case. [¶] Additionally, the juror did reveal through questioning at this juncture that he has problems with police officers in general" "and he did throw out a couple of other agencies as examples." Juror 1 "has indicated that he has set aside the information acquired from his sister-in-law which caused him to conclude—and he has indicated this, that Hawthorne Police officers are . . . 'crooked.'" Juror 1 had also said that Officer Iler was employed by the department at the time that his sister-in-law worked there, and Officer Iler "is one of the key witnesses on the issue of the gun charges" (count 2). Juror 1 had also revealed his frustration related to the treatment of his friend who was arrested when they went to the Hawthorne police on a traffic ticket issue. The court "extensively voir dired on the issue of law enforcement testimony and the weight that would be given to that testimony. [¶] And the people voir dire[d] on the process." Although juror 1 had stated "he didn't focus on this being Hawthorne," the voir dire had also focused on law enforcement generally.

Relying on juror 1's own statements, and augmented by the other jurors' reports, the court believed juror 1 "entered this process with a bias" and had committed juror misconduct. Despite extensive voir dire, the juror "didn't answer the questions with full disclosure with regard to these experiences with Hawthorne P.D. [¶] I think that the subject was covered over and over during voir dire, and he made a choice, and the choice was not to disclose. [¶] Had he disclosed, he would have definitely demonstrated a bias

13

toward Hawthorne P.D. I don't think that anybody is denying that he has a bias towards Hawthorne P.D. [¶] Now, he's saying at this time that that bias doesn't affect him. But the reality is that he went into this process with that bias. [¶] He's indicated that at this point that he believes that he can be fair. One of the other jurors indicated that at one point that he could be fair and that at another point he said he couldn't be fair. [¶] . . . [¶] . . . I do believe that this bias will and has been—had any impact on this juror in the course of his deliberation and in the course of his deliberation process. For that reason I intend to discharge the juror. I believe that the entire record will provide a demonstrable reality, [that] the juror is not an unbiased juror in this case. [¶] . . . This is Hawthorne P.D., and the testimony of Hawthorne Police officers is material . . . in this case. Particularly on Count 2 in this matter. [¶] So I think that the failure to disclose has resulted in juror misconduct, and the juror will be discharge[d]." The court discharged juror 1 and replaced him with an alternate juror.

###   C.      The record shows a demonstrable reality that juror 1 committed misconduct.

Although "[a] trial court made aware of the possibility of a juror's . . . possible misconduct occurring during the jury's deliberations, is placed on a course that is fraught with the risk of reversible error at each fork in the road" (*People v. Fuiava* (2012) 53 Cal.4th 622, 710 (*Fuiava*)), no such error occurred in this case.

Section 1089 provides: "If at any time, whether before or after the final submission of the case to the jury, a juror . . . becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty . . . , the court may order the juror to be discharged." The decision whether to discharge a juror under section 1089 is within the court's discretion, but that discretion is not unlimited. (*Fuiava*, *supra*, 53 Cal.4th at p. 711.) We apply the "'demonstrable reality' test," which "'entails a more comprehensive and less deferential review [than the substantial evidence test]. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the

14

demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied. [¶] In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides.' [Citation.]" (*Id.* at pp. 711–712.)

"It is beyond dispute that a juror who cannot follow the court's instructions because of a personal bias should be discharged under section 1089." (*Fuiava*, *supra*, 53 Cal.4th at p. 713.) During voir dire, the trial court emphasized the need for prospective jurors to disclose everything that might affect their ability to be impartial and fair to both the prosecution and the defense. The court distributed a questionnaire to each juror that asked whether any relative or close friends had a past connection with law enforcement, whether a relative or close friend had any bad experience with a police officer, and whether the juror would automatically find the testimony of a police officer less credible because the witness was a police officer. The court identified the witnesses as Hawthorne Police Department officers, and emphasized that the jurors should not generalize about police officers. Despite these specific and repeated inquiries, juror 1 did not tell the court about his experience when his friend was handcuffed by Hawthorne police, or that his sister-in-law had worked with Hawthorne police (while Officer Iler was there) and had told him that the department was "crooked." Juror 1 told the court that he felt "guilt" during deliberations, and admitted that had he realized it was the Hawthorne police department, he should have told the court about the two contacts with Hawthorne police. Nevertheless, juror 1 said he thought he could be fair, although he also conceded that "maybe" he had told the foreman and other jurors that he thought the Hawthorne police were crooked. This concession corroborated the statement of the foreperson that juror 1 had stated that his sister-in-law had told him about all kinds of things that the Hawthorne police did, and that the foreperson believed this affected juror 1's ability to be impartial. Juror 4 told the court that juror 1 had said he was uncomfortable with the officers' testimony because he knew someone who had worked for the Hawthorne police, and juror 5 said juror 1 had conceded that his previous history with the Hawthorne police

15

would change his opinion. Juror 8 told the court that juror 1 said he had a specific opinion about the Hawthorne police that would impact his ability to be fair.

The court's investigation into juror 1's objectivity explicated a "'demonstrable reality,'" consisting of statements by juror 1, the foreman, and three other jurors, that support its exercise of discretion to discharge juror 1 for misconduct in failing to reveal during voir dire that he had a negative experience with, and a negative impression of, the Hawthorne Police Department. The record also supports the discharge of juror 1 for bias against the Hawthorne police. Although juror 1 said he would evaluate the case on the evidence, "a juror need not admit a bias for the court to find that it exists." (*People v. Lomax* (2010) 49 Cal.4th 530, 590.) "'Often, the identified juror will deny it and other jurors will testify to examples of how he or she has revealed it.' [Citation.] In such circumstances, the trial court must weigh the credibility of those testifying and draw upon its own observations of the jurors throughout the proceedings. We defer to factual determinations based on these assessments." (*Ibid.*) The court properly relied on evidence that in light of the entire record supports its conclusion that bias existed, and did not abuse its discretion in discharging juror 1. (*Fuiava*, *supra*, 53 Cal.4th at p. 713.) The discharge of juror 1 therefore did not violate Canada's statutory or constitutional rights.

## II.    The photo lineup shown to Padilla was not unduly suggestive.

Canada argues that Padilla's testimony violated his due process rights because the testimony was tainted by the photo lineup shown to Padilla by the police (and in which she identified Canada), which Canada characterizes as unduly suggestive. We conclude that the photo lineup was not unduly suggestive.

During Padilla's testimony, she identified Canada in court as the man she saw standing next to her car in the carport when she went outside to buy milk. Padilla did not testify that she saw Canada again; she clarified that she had not seen Canada holding a gun (although she also testified that she had seen him reach for something under the bottom of his shirt). Although she told the 911 operator that she had seen the gun, she had seen only a shadow reflected inside the apartment when Villanueva said he saw a man with a gun.

Respondent argues that because Padilla never testified that she saw Canada with a gun, her identification of him to police as the man she saw in the carport was relevant only to count 1, assault with a firearm, as to which the jury did not reach a verdict, and "[n]one of Padilla's testimony could possibly have had an effect on the section 12021 [possession of a firearm by a felon] verdict." We disagree. Padilla testified that Canada was outside the apartment, threatened her, and grabbed for something under his shirt, just before Villanueva said he saw Canada with a gun outside the apartment window. Padilla's testimony identifying Canada as the man she saw in the carport area is relevant to support Officer Cabrera's testimony that Canada was the man he saw crouching in the carport where the officers later found the semiautomatic pistol. The jury could infer the presence of a weapon from Padilla's testimony that Canada reached for something under his shirt. While Padilla's testimony may have been cumulative, it was not irrelevant to the issue whether Canada was guilty of possession of a firearm by a felon.

Canada argues (as he did at trial) that the photo lineup shown to Padilla was unduly suggestive because it showed Canada wearing a black shirt, the same shirt he wore the night before when Padilla was unable to identify him at the field showup, and no one else in the photo lineup was similarly attired. Canada argues that showing Padilla a photo of Canada in the same clothing created a suggestive element that in effect stated: "*This* is the man." (*Foster v. California* (1969) 394 U.S. 440, 443 [89 S.Ct. 1127, 22 L.Ed.2d 402].)

To the contrary, when defense counsel challenged the photo lineup at trial, the court examined the lineup and stated that Canada was wearing a black T-shirt without any pattern; another subject was wearing a black T-shirt with a slightly different color; and yet another subject was wearing a black jacket with red zippers, so that "he's not the only individual wearing a black or dark T-shirt."[4] The court concluded that the photo lineup was not suggestive, and we agree.

---

[4] We granted Canada's motion to augment the record with a trial exhibit, a black-and-white photograph taken of Canada shortly after his arrest and shown to Padilla at trial to refresh her memory regarding what Canada was wearing on his head the night of the

17

"'In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances . . . . [Citations.]' [Citation.] If the answer to the first question is 'no,' because we find that the challenged procedure was not unduly suggestive, our inquiry into the due process claim ends. [Citation.]" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1256.) The trial court in this case examined the photographic lineup and observed that Canada was not the only subject wearing a black or dark T-shirt. Further, to the extent that Canada argues that it was unduly suggestive to show Padilla a photographic lineup including Canada's photograph after Padilla did not conclusively identify Canada the night before, we disagree. Padilla's testimony was that she told the police at the field showup on the night of the 911 call that she was not sure Canada was the perpetrator, and he might have been one of the other men in the car blocking her car. That she identified him the next day in the photographic lineup does not demonstrate that the photographic lineup was unduly suggestive. The discrepancies in her identification of Canada (including her statement to the 911 operator that he was wearing a white shirt) went to the reliability of her testimony that he was the person who threatened her in the carport. The defense argued to the jury that Padilla's identification was unreliable. While this argument may have contributed to the jury's inability to reach a verdict on the charge that Canada committed assault with a firearm, "[i]nconsistencies in her descriptions . . . are matters affecting the weight of her eyewitness testimony, not its admissibility. [Citation.]" (*Ibid.*)

Canada has not shown that the identification procedures were unduly suggestive.

confrontation in the carport. The photograph shows Canada wearing a black or dark T-shirt. We also granted Canada's request for augmentation attaching an exhibit showing the photographic lineup, which is consistent with the trial court's description.

18

### III. No instructional error occurred.

Canada argues that the trial court erred in giving three instructions. We find no error.

Canada objected to CALCRIM No. 358[5] at trial, and the trial court overruled the objection. Canada argues that the instruction implied that he had made an admission of guilt and was therefore inappropriate, citing *People v. Zichko* (2004) 118 Cal.App.4th 1055, which held that the giving of a similar instruction would be error when "the statements in [the] case constituted the criminal act charged against" the defendant. Under those circumstances, the giving of the instruction "would have been inconsistent with the reasonable doubt standard of proof." (*Id.* at pp. 1059–1060.) Here, however, Canada's utterance was not the criminal act charged against him, but only an aggressive statement which the prosecution argued helped explain why he committed assault with a semiautomatic firearm against Villanueva, the count on which the jury could not reach a verdict. Under such circumstances, trial courts are *required* to instruct jurors sua sponte to consider a defendant's out-of-court statements with caution and that the jury cannot base a conviction on such statements alone. (*People v. McKinnon* (2011) 52 Cal.4th 610, 679.) This required instruction extends "to any oral statement of the defendant, whether made before, during, or after the crime." (*People v. Carpenter* (1997) 15 Cal.4th 312, 393, superseded by statute on other grounds as recognized in *Verdin v. Superior Court* (2008) 47 Cal.4th 1096, 1106–1107.) No prejudice to Canada resulted from the giving of an instruction whose "'purpose . . . is to assist the jury in determining if the statement was in fact made.' [Citation.]" (*Ibid.*)

---

[5] As given, CALCRIM No. 358 states: "You have heard evidence that the defendant made oral statements before the trial. You must decide whether the defendant made any of these statements, in whole or in part. If you decide that the defendant made such statements, consider the statements, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statements. [¶] Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded."

Canada also objects to the giving of CALCRIM No. 359,[6] which the court gave as a matter of course with CALCRIM No. 358. Defense counsel did not make a separate objection to CALCRIM No. 359.[7] "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818. [Citation.]" (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.)

CALCRIM No. 359 expresses the corpus delicti rule, instructing the jury not to base any true finding on a defendant's out-of-court statement alone: "[T]he prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–1169; see *People v. Reyes* (2007) 151 Cal.App.4th 1491, 1498.) "The independent proof [of the corpus delicti] may be circumstantial and need not be beyond a reasonable doubt." "In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered . . . to strengthen the case on all issues." (*Alvarez*, at p. 1171.)

The Sixth District recently identified a risk of confusion in CALCRIM No. 359: "[T]he reference to identity in CALCRIM No. 359 presents a risk of confounding the jury

---

[6] As given, CALCRIM No. 359 states: "The defendant may not be convicted of any crime based on his out-of-court statements alone. You may only rely on the defendant's out-of-court statements to convict him if you conclude that the other evidence shows that the charged crime was committed. [¶] That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] The identity of the person who committed the crime may be proved by the defendant's statement alone. [¶] You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

[7] After the court decided it would give CALCRIM No. 358, it stated: "Then, obviously, I'm giving 359 too," and defense counsel said, "Yes."

by telling jurors that a defendant's inculpatory extrajudicial statements, taken alone, do not suffice to allow the jury to convict the defendant of a charged crime—and yet those statements, again taken alone, are entertainable to prove the defendant's 'identity [as] the person who committed the crime' (CALCRIM No. 359, 3d par.) which to any juror can only mean the defendant's identity as the perpetrator, i.e., the guilty party. The instruction requires reconsideration." (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1429, fn. omitted (*Rivas*).) Canada's opening brief was filed before the Sixth District decision, but Canada makes the related argument that CALCRIM No. 359 invited the jury to convict him on his statement and other evidence not amounting to proof beyond a reasonable doubt.

We need not decide whether to join the Sixth District in its criticism of CALCRIM No. 359, as even if error occurred in the giving of the instruction, it was harmless in this case. As *Rivas* pointed out, CALCRIM No. 359 itself as given told the jury "'[y]ou may not convict a defendant unless the People have proved [his] guilt beyond a reasonable doubt.'" (*Rivas*, *supra*, 214 Cal.App.4th at p. 1428, fn. 5.) The court in this case, as in *Rivas*, also gave the jury CALCRIM No. 220, defining reasonable doubt. (*Id.* at pp. 1429–1430.) Further, the jury in this case did not convict Canada of the offense closely connected with his statements to Padilla, assault with a semiautomatic firearm on Villanueva (count 1). Nor do we see a reasonable probability that absent the arguably contradictory language in the instruction, the conviction on count 2 would not have occurred. (*Id.* at p. 1430; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) There was strong evidence supporting count 2, felon in possession, the only count of conviction, unrelated to Canada's statement to Padilla. "It is not likely that the jury relied significantly on his statements in reaching the verdict[]" on count 2. (*Rivas*, at p. 1430.)[8]

---

[8] "We look to the effect of the error on *this* jury, not some hypothetical jury," to determine whether the instruction, even if erroneous, prejudiced Canada under *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705]. (*Rivas*, *supra*, 214 Cal.App.4th at p. 1430, fn. 10). *This* jury declined to convict Canada on count 1, to which his extrajudicial statement was directly related.

Given our conclusion that any error in giving the standard instruction did not prejudice Canada, we reject his claim that his counsel was ineffective for failing to object to the giving of CALCRIM No. 359.

Further, having failed to identify any error, we reject Canada's claim that cumulative error requires reversal of his conviction.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


MALLANO, P. J.


ROTHSCHILD, J.

22