Filed 8/27/24  P. v. Benjamin CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G061899 |
| v. | (Super. Ct. No. C-98445) |
| RUDOLPH BENJAMIN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a postjudgment order of the Superior Court of Orange County, Steven D. Bromberg, Judge. Affirmed.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A.

Swenson and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

$$* \qquad * \qquad *$$

Defendant Rudolph Benjamin was convicted in 1993 of two counts of first degree murder with a multiple-murder special-circumstance finding. His convictions were affirmed on direct appeal. Benjamin now challenges the trial court's denial of his petition for resentencing pursuant to Penal Code section 1172.6.[1] We affirm. Substantial evidence supports the court's finding that the evidence at Benjamin's jury trial established his guilt beyond a reasonable doubt under the revised versions of sections 188 and 189.

## FACTUAL BACKGROUND

Luis Herrera owned the Cartoons and Capers nightclub in Anaheim, California (the club). Herrera lived in an apartment near the club with his girlfriend, Diane Swarbrick.

On the evening of May 30, 1989, Gabriel S. was with Herrera at the club when Benjamin entered at about 10:00 p.m. Benjamin was with three or four other men. Herrera left the club briefly with two of the other men, who wanted to obtain the keys to a motor home. One of the other men stayed inside the club with Benjamin; Gabriel overheard Benjamin tell this man, apparently referring to Herrera, "'I'm going to waste this motherfucker.'"

---

[1] Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) Although Benjamin filed his petition under former section 1170.95, we treat it as a request pursuant to section 1172.6. All further statutory references are to the Penal Code.

2

When Herrera returned to the club, Gabriel told him what Benjamin had said. Benjamin and Herrera then yelled at each other and had a "high intensity argument," which one witness testified lasted about 20 minutes. Gabriel heard Benjamin tell Herrera he wanted a cut of Herrera's action. Herrera appeared nervous and upset. At about 2:00 a.m. on May 31, Herrera and Gabriel left the club; Herrera dropped Gabriel off at Gabriel's home in Cypress before going to his own apartment.

Charles S. lived in the apartment next door to Herrera and Swarbrick. Both apartments were on the second floor and were accessed only by a single stairway that led directly toward Charles's front door. Sometime after 2:00 a.m. on May 31, Charles heard footsteps running up the stairway and into Herrera and Swarbrick's apartment; Charles assumed it was Herrera. Fifteen or twenty minutes later, Charles heard two sets of footsteps heading toward Herrera's apartment. Five to ten minutes later, he heard two gunshots, followed by three more gunshots, coming from Herrera's apartment. After another five or ten minutes, Charles heard the door to the neighboring apartment shut and heard two sets of footsteps going towards the stairs. Charles peeked through the blinds covering the glass door of his own apartment and saw two men going down the stairs. Charles recognized one of the men as Benjamin.

Charles did not call the police because Herrera had previously threatened him with violence if he ever informed on him for selling drugs and because Charles thought Herrera might simply have been fooling around with his gun. When shown a six-pack photographic lineup two weeks after the shooting, Charles "immediately" identified Benjamin. At trial, Charles was positive of his identification of Benjamin.

Shirleen H. also lived in an apartment adjacent to Herrera and Swarbrick's. At about 3:00 a.m. on May 31, she heard five gunshots. She cracked open her front door and saw two men going down the stairs. She did not get a good enough look to be able to identify them.

The bodies of Herrera and Swarbrick were found by a neighbor later that morning. Herrera's body was on the living room couch. Swarbrick's body was partially inside the closet in the master bedroom. There was no evidence of forced entry into the apartment and no signs of a struggle. The police found .380 caliber shell casings from a semi-automatic handgun near both bodies. A nine millimeter semi-automatic handgun was found in a nightstand in the master bedroom, undisturbed.

Swarbrick had two gunshot wounds to her chest and one grazing wound on her left forearm. She also suffered superficial wounds around her neck that may have been caused by a knife or by a chain or wire held tightly around her neck. The wound on her forearm had stippling, indicating that when the weapon was fired the muzzle was four to six inches away. Swarbrick bled to death due to the gunshot wounds to her heart, lung, liver, and stomach. The medical examiner testified her death was not instantaneous.

Herrera died as a result of two gunshot wounds to his head. Stippling on a wound on his cheek indicated the gun had been held three to six inches from his face.[2]

Benjamin's palm prints were found inside the front door and on the dining room table in Herrera's apartment. Benjamin had been a guest at

---

[2] The evidence suggests there also were two young children in the apartment at the time of the shootings, including the daughter of Herrera and Swarbrick.

a party in the apartment one week before the murders. The police, however, described the apartment as "clean" and "immaculate" on the day the bodies were found.

Benjamin admitted he knew the police were looking for him in connection with the murders of Herrera and Swarbrick, but claimed he did not contact the police because he had outstanding traffic warrants. When Benjamin was arrested for the murders of Herrera and Swarbrick more than three years later, he gave the police a false name, and when police showed him a photograph of himself, he denied it was him.

Benjamin testified on his own behalf that he was not involved in the murders of Herrera and Swarbrick. Benjamin admitted he was a drug dealer and Herrera was his supplier. Benjamin explained he would buy a kilogram of cocaine from Herrera for $13,000 and then sell it for $14,500. Because he sold an average of 10 kilograms of cocaine a week, his earnings amounted to about $15,000 per week. Benjamin claimed he had no reason to kill Herrera because he obtained drugs from Herrera more cheaply than from other suppliers, and Herrera's death hurt his drug dealing business. Benjamin denied saying he would waste Herrera or saying he wanted a cut of Herrera's business.

## PROCEDURAL HISTORY

Benjamin was charged with two counts of murder. (§ 187, subd. (a).) The information alleged as a special circumstance that Benjamin had committed more than one murder. (§ 190.2, subd. (a)(3).) The jury convicted Benjamin of the first degree murders of both Herrera and Swarbrick and found the multiple-murder special circumstance to be true. The trial court sentenced Benjamin to life in prison without the possibility of

5

parole. The judgment was affirmed on appeal. (*People v. Benjamin* (June 29, 1995, G015374) [nonpub. opn.].)

In 2019, Benjamin filed a resentencing petition pursuant to section 1172.6. The trial court concluded the legislation enacting that statute was unconstitutional and denied the petition without prejudice. In an unpublished opinion, another panel of this court reversed that decision and remanded the case to the trial court to consider the petition on its merits. (*People v. Benjamin* (Aug. 4, 2020, G057554) [nonpub. opn.].)

On remand, the trial court found Benjamin's resentencing petition made a prima facie showing under section 1172.6 and issued an order to show cause. Following briefing and a hearing at which neither party provided any additional evidence, the trial court denied the petition. The court concluded the evidence demonstrated beyond a reasonable doubt that Benjamin either was the actual killer of both Herrera and Swarbrick or, at a minimum, that he aided and abetted the killer.

Benjamin filed a timely notice of appeal.

DISCUSSION

On appeal from the denial of a section 1172.6 petition following an evidentiary hearing, the trial court's determination is reviewed for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) "Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Ibid.*) In applying the substantial evidence test, "''we review the entire record in the light most

favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" [Citations.] Substantial evidence also "'includes circumstantial evidence and any reasonable inferences drawn from that evidence.'"" (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951.)

Based on the facts here—and the inferences that reasonably could be drawn from them—we conclude substantial evidence supports the trial court's finding that the evidence at trial established beyond a reasonable doubt that Benjamin was guilty of the murders of Herrera and Swarbrick.

As an initial matter, Benjamin acknowledges the evidence was sufficient to support the trial court's ruling as to Herrera. He does not challenge that part of the court's order.[3] We agree the evidence is sufficient to permit a reasonable trier of fact to find Benjamin guilty of Herrera's murder beyond a reasonable doubt, either as the actual killer or as an aider and abettor. A few hours after Benjamin threatened to kill Herrera, his drug supplier, demanded a cut of Herrera's action, and engaged in a long, loud

_____

[3] Benjamin's opening brief states: "Benjamin recognizes that evidence highlighted by the court was sufficient to warrant the court's finding that as to victim Herrera, Benjamin may arguably have had the requisite intent to kill, as well as a demonstrated motive. For purposes of this brief, he does not claim the evidence was insufficient to support the court's ruling as to Herrera."

argument with him, Benjamin was observed at the scene of the crime with one other person. Benjamin's palm prints were found at two different locations inside Herrera's apartment. Knowing the police were looking for him in connection with the murders, Benjamin hid from the police and gave a false name when they finally apprehended him. When police showed Benjamin a photo of himself, he denied it was him.

Benjamin limits his argument on appeal to whether the evidence supports a finding of guilt as to the murder of the second victim, Swarbrick.[4] Benjamin argues: (1) there is no evidence Benjamin either killed or aided or abetted the killing of Swarbrick, and any argument that he did is based on pure speculation; (2) the trial court improperly invoked the felony-murder rule to deny resentencing; and (3) the court did not act as an independent fact finder, but rather improperly relied on and "adopted" factual statements and legal conclusions set forth in the Court of Appeal's 1995 opinion affirming Benjamin's conviction. (*People v. Benjamin, supra*, G015374.) We find no merit in any of these arguments.

The threshold question before us is whether there was sufficient evidence from which a reasonable trier of fact could find Benjamin guilty beyond a reasonable doubt of Swarbrick's murder, either as the actual perpetrator or as a direct aider and abettor. We conclude there is.

---

[4] If the court were to conclude that Benjamin could not, under current law, be convicted of Swarbrick's murder, the trial court necessarily would have to reverse the jury's true finding on the multiple-murder special circumstance (§ 190.2, subd. (a)(3)), which in turn would require resentencing on the single murder conviction. A true finding on a special circumstance under section 190.2 requires the defendant to be sentenced to death or life in prison without the possibility of parole.

Benjamin argues the evidence does not support a finding that he was guilty of aiding and abetting Swarbrick's murder because, at most, it showed only that Benjamin had an intent to kill, and that is insufficient for aiding and abetting liability. Benjamin is correct that more than an intent to kill is necessary for aiding and abetting liability; but he is wrong that there is no hypothesis upon which substantial evidence exists to support the trial court's conclusion that Benjamin was guilty beyond a reasonable doubt of aiding and abetting the killing of Swarbrick. (See *People v. Vargas, supra*, 84 Cal.App.5th at p. 952.)

"'[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.'" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295–296; see *People v. Curiel* (2023) 15 Cal.5th 433, 468 [in addition to having an intent to kill, "[t]he aider and abettor must know the direct perpetrator intends to commit the murder . . . and intend to aid the direct perpetrator in its commission"];[5] *People v. Gentile* (2020) 10 Cal.5th 830, 843.)

The evidence shows that, at 3:00 a.m. on May 31, 1989, Benjamin and another man went to the apartment Herrera shared with Swarbrick. The fact that Benjamin had been to that very apartment for a party just a week earlier supports an inference he knew both Herrera and Swarbrick lived there, and the fact that it was 3:00 in the morning supports an inference he

[5] *People v. Curiel* was decided after briefing was complete in this appeal. This court advised the parties to be prepared to address the case at oral argument.

knew both Herrera and Swarbrick would be at home. Given that only a few hours earlier Benjamin had vociferously argued with Herrera and said he was "going to waste" him—a common slang term for kill—the evidence supports the conclusion that Benjamin intended to kill not only Herrera but anyone else in the apartment who might interfere with Herrera's murder, scream or phone for help, or later identify Benjamin as the killer. The fact that Benjamin took another person with him also reasonably supports an inference that Benjamin knew Herrera would not be alone and that it would be necessary to have someone to assist him.

That Herrera and Swarbrick were shot in fairly rapid succession and both were shot with a .380 caliber weapon supports an inference that a single shooter, with a single gun, killed both Herrera and Swarbrick. Benjamin correctly notes there is no evidence showing whether Benjamin was that single shooter, or whether the shooter was the unidentified man who went to the apartment with Benjamin on May 31. In either event, substantial evidence supports the trial court's finding that Benjamin was guilty of murder beyond a reasonable doubt, either because he personally shot both victims or because he directly aided and abetted the shooter with the requisite knowledge and intent.

The evidence supports a reasonable inference that whichever of the two men was the actual killer, he killed Herrera first, while the other man dealt with Swarbrick by chasing her into the bedroom (or by finding her in the bedroom trying to hide herself and/or her children) and then by restraining her by holding a knife to her throat or choking her with a chain held tightly enough around her neck to leave ligature marks. The evidence that two clusters of gunshots were heard fairly close to one another supports a reasonable inference that once the shooter had executed Herrera with two

10

point-blank gunshots to the head, he immediately went to the bedroom where Swarbrick was being choked and subdued and shot her twice in the chest and a third time in the arm at very close range.

If it was Benjamin who executed Herrera with the .380 caliber weapon at point blank range and then went to the bedroom—where his confederate was restraining Swarbrick—and fired two shots into Swarbrick's chest, the evidence amply supports Benjamin's two first degree murder convictions, along with the multiple-murder special-circumstance finding.

On the other hand, if Benjamin was not the actual shooter, but was the one who attacked and subdued Swarbrick to prevent her from phoning or crying out for help or from interfering with the shooter who was in the process of executing Herrera, substantial evidence supports Benjamin's murder convictions as a direct aider and abettor, as well as the multiple-murder special-circumstance finding. A trier of fact could reasonably conclude that restraining and silencing Swarbrick (by choking or with a knife) until the accomplice with the gun could finish executing Herrera and then come turn the gun on her constitutes "aid[ing], promot[ing], encourag[ing] or instigat[ing]" her killing. (*People v. Gonzales and Soliz, supra*, 52 Cal.4th at pp. 295–296.) The fact that Benjamin and his accomplice left Swarbrick to bleed to death from the two gunshot wounds in her chest is further evidence supporting an inference that both shared an intent to kill her.

None of this is pure speculation or conjecture, as Benjamin suggests. These are reasonable inferences drawn from substantial evidence that was introduced at the trial and was then presented to the trial court at the hearing on the order to show cause in the form of the transcript of the trial proceedings. It is a truism that not all killings are committed in the presence of witnesses or happen to be captured on video. When evaluating

11

circumstantial evidence presented in support of a murder charge, the trier of fact is entitled to draw—indeed, often is required to draw—reasonable inferences from that evidence. (*People v. Vargas, supra*, 84 Cal.App.5th at p. 951; *People v. Nieber* (2022) 82 Cal.App.5th 458, 476.) The court's reliance on reasonable inferences to find Benjamin guilty beyond a reasonable doubt provides no basis to reverse its denial of Benjamin's section 1172.6 petition.[6]

In sum, we conclude the inferences reasonably drawn from the evidence recited above constitute substantial evidence supporting the trial court's findings that (1) both Benjamin and the man who accompanied him to Herrera and Swarbrick's apartment in the early morning hours of May 31, 1989, intended to kill both Herrera and Swarbrick, (2) if Benjamin was not the actual killer he was aware of the other man's intent to kill, and (3) Benjamin either was the actual killer or, at a minimum, he took steps to aid and abet the actual killer by restraining Swarbrick while the shooter executed Herrera and then came to the bedroom to kill Swarbrick, too.

Benjamin argues that, in denying his section 1172.6 petition after the hearing on the order to show cause, the trial court impermissibly relied on the felony-murder rule to find him guilty beyond a reasonable doubt of the two murders. Benjamin points to the court's somewhat cryptic statement in its ruling that "[t]he defendant failed to identify any evidence adduced at trial that could support a theory that the murders were completely unrelated to any underlying crime." It is not clear to us what the court intended by that statement. But it *is* clear, reading the court's ruling in its entirety, that the

---

[6] That Benjamin denied having anything to do with the murders of Herrera and Swarbrick does not alter our analysis. On a substantial evidence review, "'"we review the entire record in the light most favorable to the judgment."'" (*People v. Vargas, supra*, 84 Cal.App.5th at p. 951.)

court did not deny Benjamin's section 1172.6 petition based on application of the felony-murder rule. The court correctly noted that "[t]he evidence does not support that a felony murder theory was relied upon for the conviction." The court also made clear it was denying Benjamin's resentencing petition because substantial evidence supported a finding, beyond a reasonable doubt, that Benjamin was either the actual shooter of Swarbrick or he directly aided and abetted the actual shooter.

For this reason, the parties' supplemental briefing on *People v. Burgess* (2023) 88 Cal.App.5th 592 (*Burgess*) misses the mark. In *Burgess*, the appellate court concluded the prosecution failed to prove beyond a reasonable doubt that the defendant could have been found guilty of murder under the current law. (*Id.* at p. 595.) The defendant had been convicted of first degree felony murder and attempted robbery, with attempted robbery as the predicate felony. (*Id.* at p. 599.) Although the appellate court found the trial court, in ruling on the resentencing petition, acted properly by independently determining whether the defendant had committed attempted robbery (*id.* at p. 602), it concluded there was insufficient evidence to support the trial court's finding as to attempted robbery because the evidence established only that the defendant had committed attempted theft by false pretenses (*id.* at p. 606). Because attempted theft by false pretenses is not a predicate felony for felony murder, the appellate court concluded the defendant could not be found guilty of murder under the current law. (*Ibid.*) The facts here, however, are materially distinguishable from those in *Burgess*. As noted above, Benjamin was not prosecuted on a felony-murder theory and the trial court did not rely on the felony-murder doctrine in denying Benjamin's section 1172.6 petition.

13

Similarly, the fact that the jury was instructed at trial on a natural and probable consequences theory of murder does not warrant reversal of the trial court's finding. As the court correctly noted, the prosecutor never argued the natural and probable consequences doctrine at trial. Where the jury is instructed on the natural and probable consequences doctrine but the prosecutor does not argue that theory to the jury but actually argues the defendant intended to commit all the charged offenses, we assume the jury did not rely on that doctrine. (*People v. Estrada* (2022) 77 Cal.App.5th 941, 948; *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1432; see *People v. Prettyman* (1996) 14 Cal.4th 248, 273.)

We also reject Benjamin's argument that the trial court failed to act as an independent fact finder in conducting a review of the transcript of the trial proceedings, but instead simply adopted factual findings or legal conclusions from the appellate court's earlier opinion affirming Benjamin's conviction. Nothing in the record supports this argument. The court's written ruling on Benjamin's petition states that the court had considered the record of conviction, which necessarily includes the trial transcript. Indeed, the court stated on the record at the hearing on the order to show cause that he was "intimately familiar" with the facts of the case. Benjamin provides no basis for us to question or reject the court's statements.[7] Moreover, the court's reference to a statement in the prior appellate opinion that "wasting" someone is a synonym for killing them does no more than reiterate the well-

---

[7] In requesting that this court take judicial notice of the superior court's records of Benjamin's trial proceedings, including the transcripts of the trial, Benjamin's appellate counsel noted: "Indeed, the trial transcripts are relevant to this appeal in that the court, in denying his section 1172.6 petition, *expressly relied on the entire record of conviction, including the evidence presented at appellant's 1993 trial.*" (Italics added.)

known definition of the slang term. It certainly does not amount to an abdication by the court of its responsibility to independently review the trial transcript to determine if it contains substantial evidence that Benjamin was guilty beyond a reasonable doubt of both murders, either as a direct perpetrator or as a direct aider and abettor of the shooter.

DISPOSITION

The postjudgment order denying Benjamin's petition for resentencing is affirmed.


GOODING, J.

WE CONCUR:


O'LEARY, P. J.


MOTOIKE, J.

15