Filed 10/21/25  P. v. Perez CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. VINCENT ANTHONY PEREZ, Defendant and Appellant. | D086174 (Super. Ct. No. RIF1801411) |

APPEAL from a judgment of the Superior Court of Riverside County, Matthew Perantoni, Judge.  Affirmed.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers and Matthew Mulford, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Vincent Anthony Perez of murdering Emil C. and personally discharging a firearm while actively participating in a criminal

gang. (Pen. Code,[1] §§ 187 190.2, subd. (a)(22) & 12022.53, subd. (d).) He was also found guilty of illegally possessing a firearm after a felony adjudication (§ 29800, subd. (a)(1)) and shooting at an occupied vehicle for the benefit of a criminal gang with the personal use of a firearm (§§ 246 & 186.22, subd. (b)(4)(B)). Perez later admitted he had two prior strikes and the court found an aggravated sentence was appropriate. (§§ 667, subd, (a) & 1170.12, subds. (c) & (e); Cal. Rules of Ct., rules 4.408 & 4.421.) The court sentenced him to life without parole, plus 25 years to life, plus four years.

Perez contends: (1) the six year delay in bringing the matter to trial violated his right to due process; (2) he received ineffective assistance of counsel based on counsel's failure to object to the admission of rap lyrics; (3) the trial court abused its discretion in refusing to appoint new counsel to litigate his ineffective assistance of counsel claims; and (4) the instruction that jurors could rely on Perez's statements alone to prove he was the shooter undercut the presumption of innocence. We reject his arguments and affirm the judgment.

FACTUAL BACKGROUND

A.    *The Shooting*

On the evening of August 25, 2017, Jacob S. drove his Ford Bronco to a gas-station minimart with his friend Emil. Emil stayed in the Bronco while Jacob went inside the store. Jacob walked by a group of people including Perez, a Westside Bloomas gang member, his girlfriend Summer T., and two teenagers, Michael P. and Gabriel L., who were affiliated with the gang and

---

1      Undesignated statutory references are to the Penal Code.

who looked up to Perez.[2]  As Jacob and Emil drove away, Emil shouted an insult out the window—something like "fuck Westside Bloomas."  Perez, agitated by Emil's insult, gestured at or flashed gang signs towards Jacob's car as it drove away.

Jacob drove to another store and then drove by the gas station again. When Jacob drove by, Perez was sitting in the driver's seat of Summer's parked car, with Summer in the front passenger seat, Michael seated behind her, and Gabriel behind Perez.  Perez was upset and pursued the Bronco through residential areas.  Jacob pulled onto a side street, stopped, and turned off the headlights, but Perez saw the maneuver and parked behind the Bronco.  Emil got out of the Bronco and Jacob started to open his door when he heard gunshots.  Summer claimed Perez had gotten out of the car when she and Gabriel heard gunshots from the driver's side of her car.  Emil suffered two gunshot wounds to the chest and died from the injuries.

B.    *The Investigation*

Surveillance video depicted the license plate for Summer's car and law enforcement was able to identify the four individuals inside the car. Investigators interviewed Summer, Gabriel, and Michael.  Summer stated Perez had been driving, he was the only one who got out of the car, and the shooting occurred from near the driver's side door.  Summer believed the people they were following had been with another gang, Westside Riva. Gabriel also said Perez had been driving and got out of the car.  In a drawing, Gabriel placed Perez on the driver's side of Summer's car.  This testimony

---

[2]    Based on his investigation, the prosecution's gang expert believed Summer was an active participant in the Westside Bloomas.  Michael's father and Gabriel's father were both Westside Bloomas gang members.

3

matched the physical evidence regarding the bullet's trajectory which indicated the shooter had been standing on the driver's side of Summer's car.

Michael, who was 15 years old at the time, claimed he shot Emil. When Michael described where he claimed to have been standing—to the right of, and while shooting over a passenger-side door of Summer's car—doubt arose because it seemed "physically impossible" to square Michael's account with the trajectory of the bullet and the physical evidence. When pressed, Michael said that he would take "the rap" for the shooting because a "homie" might "rot in jail" while he might be released in "10 or 15" years. The investigator believed that by saying he would take the rap, Michael was admitting to shooting the gun even though he had not done so.

## DISCUSSION

A.    *The Trial Court Properly Denied Perez's Motion to Dismiss*

1.    Additional Facts

A criminal complaint was filed against Perez in March 2018, and he was arrested in April 2018. On Perez's motion, trial was continued to February 2020 and then again until April 2020. At the readiness conference in March 2020, the court continued the trial due to the COVID-19 emergency declarations. Perez waived time and trial was continued several more times until September 2021. In March 2021, Michael passed away after a traffic collision.

After two additional continuances, Perez twice moved to continue trial because his counsel was not prepared to proceed. Between April 2022 and February 2023, the court continued trial four more times. In May 2023, Perez again requested a continuance to allow counsel time to prepare for trial. The matter was trailed to September 8, 2023, during which time the district attorney requested two continuances because she had COVID-19.

4

The day before trial, Perez sought to dismiss the case alleging the delays violated his right to due process. The trial court denied Perez's motion to dismiss finding he had not been prejudiced by Michael's death because Michael's entire interview statement would be admissible. At trial, the jury watched a video recording of Michael's two-hour interview and confession. During closing, the prosecutor argued Michael lied and took blame for the shooting "trying to protect his homie." Defense counsel argued Perez was not guilty because Michael confessed to the crime.

2.    Analysis

Perez concedes the trial court had a legitimate reason for delaying his trial due to the COVID-19 pandemic. Nonetheless, he asserts the trial court violated his right to a speedy trial under both the federal and state Constitutions because Michael died during the unjustifiable delay which prevented the defense from calling him as a witness. Perez asserts it was impossible for defense counsel to respond to the prosecutor's argument that Michael had lied and thus impossible for the jury to properly make a credibility determination. He also claims the trial court's failure to find any prejudice necessarily skewed the balancing process in which the court was required to engage.

The federal and state Constitutions guarantee a criminal defendant the right to a speedy trial. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) The federal right to speedy trial attaches with the filing of the accusatory pleading or arrest, whichever is first. (*Serna v. Superior Court* (1985) 40 Cal.3d 239, 262.) To secure dismissal based on the federal speedy trial right, the Supreme Court applies a balancing test that considers four factors: whether the delay before trial was unusually long, who—the government or the defendant—bears greater responsibility for the delay, whether the

5

defendant timely asserted the right to a speedy trial, and whether the delay prejudiced the defendant. (*Barker v. Wingo* (1972) 407 U.S. 514, 530 (*Barker*).) The defendant bears the burden of demonstrating a speedy trial violation under this four-factor test. (*People v. Williams* (2013) 58 Cal.4th 197, 233 (*Williams*).) A post-accusation delay of about a year is generally considered " 'presumptively prejudicial.' " (*Doggett v. United States* (1992) 505 U.S. 647, 652, fn. 1.) Nonetheless, because the speedy trial right is inherently imprecise, the amount of delay sufficient to trigger review depends on the specific circumstances of each case. (*Barker,* at pp. 530–531.) We review a trial court's grant or denial of a speedy trial motion for abuse of discretion based on the circumstances. (*Id.* at pp. 528–529.)

The first and second factors examine the length and responsibility for the trial delays. Here, although a criminal complaint was filed in March 2018, the trial did not take place until nearly six years later, in September 2023. The trial was twice continued at defense counsel's request, while all remaining continuances stemmed from the COVID-19 pandemic, including two attributable to the prosecutor's illness with the virus. Quarantines and health restrictions have historically been treated as valid grounds to continue a trial, given the serious risks of exposing court participants to illness. (*Elias v. Superior Court* (2022) 78 Cal.App.5th 926, 942 (*Elias*).) This long delay undoubtedly created hardship for Perez but the pandemic was an emergency outside the responsibility of both the prosecution and the court.

The third factor concerns the timely assertion of the right to a speedy trial, which the defendant is responsible for invoking. (*Barker, supra*, 407 U.S. at p. 531.) "The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right," but "failure to assert the right will make it

difficult for a defendant to prove that he [or she] was denied a speedy trial."
(*Id.* at pp. 531–532.) The inquiry is not limited to counting how many times a
defendant objected or agreed to continuances. Instead, the court looks to the
broader context—such as how timely, consistent, and genuine the objections
were, the reasons behind any acquiescence, whether the defendant had
counsel, and the defendant's overall pretrial conduct. (*Williams, supra*, 58
Cal.4th at p. 238.) Taken together, these circumstances reveal whether the
defendant truly sought a speedy trial. (*Ibid.*)

Here, although Michael confessed to the crime before Perez's arrest and
died approximately three years after Perez's arrest, the record reflects no
effort by Perez to invoke his speedy trial right. During the entire period
between arrest and trial, Perez never objected to a continuance, never
demanded that trial proceed, and never moved to dismiss on speedy trial
grounds until the eve of trial. This silence undermines any claim that Perez
genuinely sought a prompt resolution of the charges and weighs heavily
against him in the balancing analysis. In short, Perez's failure to act
demonstrates acquiescence in the delay, making it difficult to conclude that
his constitutional right to a speedy trial was denied.

The last factor—prejudice to the defendant—requires evaluating the
case in light of the interests the speedy trial right protects, preventing
oppressive pretrial incarceration, reducing the accused's anxiety, and
avoiding impairment of the defense. (*Barker, supra*, 407 U.S. at p. 532.) The
last interest is the most critical, since delays that hinder trial preparation
threaten the fairness of the entire system, especially when witnesses die,
disappear, or lose the ability to recall past events accurately. (*Ibid.*) Perez
contends that Michael's death was prejudicial because only law enforcement
was able to interview him. However, nearly two and one-half years elapsed

7

between Michael's confession and his death, providing ample opportunity for the defense to interview him. Further, Michael's prior statement that he was willing to "go down for some shit I didn't do" suggests that, if he had testified at trial under oath, his account could have shifted in a way detrimental to Perez. Accordingly, the record does not support a finding of prejudice sufficient to weigh in the Perez's favor under the federal speedy trial analysis.[3]

B. *No Ineffective Assistance of Counsel in Admitting Rap Lyrics*

    1.     Additional Facts

Perez and Summer were in a romantic relationship. At trial, the jury heard, without objection, a jailhouse phone call Perez made to Summer. The recording began with a voice-over warning giving notice that the call was "subject to recording and monitoring." Perez sang or rapped:

> "I told 'em if they don't wanna see me that I'm a Westside hustler. I told 'em I'm from the West and I'm holdin' the jacket 'cause some of them killers they bad actors. I watch it how to do it ass backwards. Man, a matter of fact, that's my homeboy factor."
>
> "[¶] . . . [¶]
>
> "That's what's up. That's what's crackin'. I'm from the numbers, that's what bracken and stay, mother fucker happenin'. Hell yeah I got to have some the crafts. If you stupid snatch your hat. . . . I wake up with them rats. . . . I stay flowing. Fools ain't knowing—why you going' (unintelligible)."

---

[3]     Perez mentioned the state constitutional right to a speedy trial in the trial court but he forfeited any claim that his state right was violated by failing to make such an argument with citations to pertinent authority and reasoned analysis in his opening brief. (*People v. Clayburg* (2012) 211 Cal.App.4th 86, 93 [failure to present "reasoned argument and analysis" forfeits issue on appeal].)

According to the prosecution's gang expert, these lyrics referenced Perez putting in work for the Westside Bloomas gang and being part of the gang. Summer stated that "being from the numbers" meant the numbered-street neighborhood of Bloomington, which was part of the territory of the Westside Bloomas. The prosecution gang expert used Perez's rapping as one factor indicating that Perez was a gang member. In closing, the prosecutor argued that Perez's rap to Summer demonstrated him being a proud gang member who committed the murder based on Emil's disrespect of the gang.

2.    Analysis

Defense counsel did not object to the recitation and admission of the rap lyrics, forfeiting the issue. (Evid. Code, § 353 [party may not complain on appeal that evidence is inadmissible absent a timely and specific objection on that ground below].) Perez nevertheless argues counsel rendered ineffective assistance by failing to object, claiming the trial court likely would have excluded the evidence.

To establish ineffective assistance, a defendant must show both that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's errors, there is a reasonable probability of a more favorable outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) A reviewing court may resolve the claim on the ground of lack of prejudice alone. (*Id.* at p. 697.) And on direct appeal, a conviction will be reversed only if the record affirmatively establishes counsel had no rational tactical purpose, was asked for a reason and provided none, or could have had no satisfactory explanation. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Even assuming counsel had grounds to object, Perez cannot show prejudice. An error is prejudicial only if there was a "*reasonable chance*, more than an *abstract possibility*," that it affected the verdict. (*College Hospital*

*Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) Here, the record shows no such chance.

The prosecution presented extensive independent evidence of guilt. The gang expert testified that Perez was a Westside Bloomas member, "respect is everything" in gang culture, members violently retaliate against disrespect or intrusions, and the shooting was committed for the gang's benefit. Two witnesses—Summer and Gabriel—told law enforcement that Perez was driving, he was the only person to exit the car, that the shots came from the driver's side of Summer's car. Gabriel testified similarly at trial.

Although Michael claimed he was the shooter, he contradicted himself by admitting he was prepared to "go down for some shit I didn't do," because it was what he had "sign[ed] up for." His confession was also undermined by physical evidence suggesting it was "physically impossible" to reconcile his account with the bullet trajectory and crime scene findings. After learning of Michael's claim, Gabriel expressed surprise, stating he had personally seen the shooter, it was not Michael, and Michael was "stupid" to take the blame.

Considering this overwhelming evidence, Perez cannot establish a reasonable probability of a different outcome had the rap lyrics been excluded.[4] His ineffective assistance claim therefore fails.

---

[4] Perez's reliance on *People v. Venable* (2023) 88 Cal.App.5th 445 (review granted May 17, 2023, S279081) to show the prejudicial effect of the rap lyrics is misplaced. In *Venable*, the evidence of defendant's involvement was weak, consisting of a police informant who gave conflicting accounts and testified the defendant was being framed. (*Id.* at p. 458.) In contrast, defendant's aunt supplied an alibi, and defendant denied any role in the shooting. (*Ibid.*) Here, in contrast, two witnesses identified Perez as the shooter and the physical evidence supported their testimony.

C.     *The Trial Court Properly Denied Replacement Counsel*

    1.     Additional Facts

In a police interview held about two months after the shooting, Michael admitted to using a .38 caliber gun, which he disposed of following the incident.  He told police that about three weeks to a month earlier, a person name Anthony R. from Bloomington had been arrested with a .38 caliber gun.  At sentencing, Perez told the court he believed his counsel may have been ineffective because he asked counsel to follow-up on Michael's claim that he gave the gun to a man named Anthony R. in Bloomington.  Perez said his counsel and investigator did not find an Anthony R. arrested for a firearm but that a private investigator hired by his family learned that Anthony R. had been arrested with the gun described by Michael.

Perez claimed this failure to investigate violated his right to due process and raised a doubt whether he received a complete defense.  The prosecutor replied that Michael's entire interview had been played for the jury and the information about Anthony R. was part of the evidence.  After the court asked for clarification, Perez indicated he wanted defense counsel relieved, and another attorney appointed to investigate the issue and file a new trial motion.  The court held a *Marsden*[5] hearing, which it ultimately denied.  Following the hearing, Perez stated he was prepared to proceed with sentencing.

    2.     Analysis

Perez contends the trial court abused its discretion in denying his request for new counsel.  He argues that if defense counsel had located the gun, ballistic testing could have been conducted to compare it to the murder weapon, and the results would have corroborated Michael's confession.

---

[5]     *People v. Marsden* (1970) 2 Cal.3d 118.

11

Ineffective assistance of counsel is not among the statutory grounds for a new trial (§ 1181), but courts have nonetheless allowed new trials on that basis. (See, e.g., *People v. Smith* (1993) 6 Cal.4th 684, 692–693, 695 (*Smith*).) When a defendant makes a posttrial request for the appointment of new counsel to pursue a motion for new trial on the ground of ineffective assistance, the court must hold a hearing so the defendant can explain the claim. (*Id.* at p. 692.) Once the defendant has been afforded that opportunity, the decision whether to appoint new counsel rests within the trial court's discretion, and we will reverse only upon a showing of abuse of discretion. (*People v. Streeter* (2021) 54 Cal.4th 205, 230.) Substitution of counsel is warranted when the trial court concludes that continued representation would substantially impair the defendant's right to assistance of counsel. (*People v. Sanchez* (2011) 53 Cal.4th 80, 89.) This standard is met where counsel is not providing adequate representation, or where an irreconcilable conflict exists that threatens effective representation. (*Ibid.*)

There is no error here. The *Marsden* hearing transcript does not show a breakdown of the attorney-client relationship or an irreconcilable conflict, and Perez does not argue otherwise on appeal.[6] Instead, he asserts that evidence showing Michael gave the gun to Anthony R. would have corroborated Michael's confession and created reasonable doubt in the jurors' minds regarding the identity of the shooter. Defense counsel confirmed that Perez had told her Anthony R. was arrested with a gun two weeks after the shooting, and that a newspaper article reported a gang member's arrest with a gun. Counsel had both a paralegal and an investigator attempt to locate

---

[6] The People filed an application for the *Marsden* transcript. (Cal. Rules of Court, rule 8.47(b)(1)(A).) Receiving no opposition, we granted application. We did not receive a request from the People to file a supplemental brief.

the article, but neither was successful.  Perez also refused to provide information about the investigator hired by his family.

We begin with the presumption that counsel's performance fell within the broad bounds of professional reasonableness and accord great deference to strategic choices.  (*People v. Lewis* (2001) 25 Cal.4th 610, 674.)  Here, defense counsel pursued the lead but was unable to uncover any corroborating evidence.  Her decision to forgo further investigation was a tactical one, made against the backdrop of Perez's own refusal to assist in his defense by sharing information about the private investigator retained by his family.  Counsel could reasonably have concluded that contacting Anthony R. was more likely to harm than to help, since it was Perez—not Michael—who knew Anthony's last name, suggesting Perez had a closer connection to the gun than he admitted.  Interviewing Anthony R. carried the risk of eliciting testimony that Perez himself had transferred the gun, which would have undercut rather than advanced his claim of innocence.  On this record, the challenged decision reflects a considered tactical judgment, not ineffective assistance.

In any event, defense counsel did not ignore the issue at trial.  She cross-examined a Riverside County sheriff's investigator about law enforcement's failure to follow up on Michael's statements concerning the gun.  The investigator admitted Anthony R. had been convicted of gun possession, though the San Bernardino sheriff's department never recovered the weapon.  Counsel relied on this testimony in closing to argue that Michael's confession was corroborated and that law enforcement had failed to pursue evidence that might have implicated another suspect.  Ultimately, however, whether Perez or Michael supplied Anthony R. with a gun would not have resolved the central question of who fired the fatal shots.

The record demonstrates that defense counsel pursued reasonable investigative steps, made a tactical decision supported by potential justification, and effectively used available evidence at trial. Perez's claim falls far short of establishing that counsel's performance was deficient, let alone that any alleged deficiency prejudiced the outcome. Because Perez failed to present a colorable claim of ineffective assistance, the trial court acted well within its discretion in denying the *Marsden* motion and declining to appoint new counsel.

D.      *The Trial Court Properly Instructed the Jury*

1.      Additional Facts

The prosecution introduced two pre-trial audio recordings of Perez. About three weeks before the shooting, Perez and Summer spoke to Westside Bloomas gang member, Mike Guerra, on the telephone. Guerra was in jail and the call was recorded. Perez complained that certain people were "wearing my bones down" and that these people had him being "the judge, the jury and the counsel and the counsel and the executioner, they're all fucking, eh, the prosecutor, the DJ, … everything." The prosecutor mentioned this phone call during closing when addressing whether the shooting was carried out in furtherance of the gang. The second recording is Perez rapping with Summer.

Without objection, the trial court instructed the jury with CALCRIM No. 359, which stated:

> "The defendant may not be convicted of any crime based on his out-of-court statement alone. You may rely on the defendant's out-of-court statement to convict him only if you first conclude that other evidence shows that the charged crime was committed. [¶] That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] This requirement of other evidence does not apply to proving the identity of the person who committed the crime. *If other evidence shows that the charged crime*

14

*was committed, the identity of the person who committed it may be proved by the defendant's statement alone.* [¶] You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt." (Italics added.)

2. Analysis

Relying on *People v. Rivas* (2013) 214 Cal.App.4th 1410 (*Rivas*), Perez contends, under the facts of this case, the trial court erred instructing jurors with the italicized language that they could rely on Perez's "statements alone" to infer identity. He argues that, even taken collectively, these "statements alone" were insufficient to prove beyond a reasonable doubt that he was the shooter. Thus, the trial court's instruction to jurors that they could rely on his "statements alone" to find the identity of the shooter gave jurors an impermissible shortcut which undercut the state's burden of proving identity beyond a reasonable doubt.[7]

CALCRIM No. 359 embodies the corpus delicti rule, which requires the prosecution to present evidence that a crime occurred independent of the defendant's out-of-court statements. (*People v. Ledesma* (2006) 39 Cal.4th 641, 721.) The showing may be minimal and need not connect the defendant to the crime. (*Ibid.*) The rule does not demand independent proof of the defendant's identity as the perpetrator. (*Ibid.*) Once the existence of a crime is established, however, the defendant's own out-of-court admissions may be used to prove he or she committed it, as identity is not part of the corpus delicti. (*Ibid.*) The corpus delicti "rule is intended to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1169.) Whenever a

---

7    Although Perez failed to object to the instruction, we reach the merits of his claim since *Rivas* found no forfeiture where the challenged instruction affected a defendant's fundamental rights. (*Rivas, supra*, 214 Cal.App.4th at p. 1421.)

15

defendant's extrajudicial statements form part of the prosecution's case, the trial court must sua sponte instruct the jury that conviction requires some additional proof the crime occurred. (*Id.* at p. 1170.)

We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) In reviewing the instructions, we assume the jurors are intelligent persons, capable of understanding and correlating the given instructions. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 (*Ramos*).) In reviewing a claim that the given instructions lowered the standard of proof, we consider whether there is a reasonable likelihood the jury misapplied the instruction. (*Victor v. Neb.* (1994) 511 U.S. 1, 6.) We do not view the challenged instruction in isolation but consider it in the context of the instructions as a whole. (*People v. Moore* (2011) 51 Cal.4th 1104, 1140.)

As a preliminary matter, *Rivas, supra*, 214 Cal.App.4th 1410, addressed an earlier version of CALCRIM No. 359. At that time, the third paragraph of the instruction stated only: "The identity of the person who committed the crime [and the degree of the crime] may be proved by the defendant's statement[s] alone." (*Rivas,* at p. 1428, fn. 5; CALCRIM No. 359, 2013 ed.) In response to *Rivas*, the Judicial Council of California amended the instruction by adding the additional language now found in its current version. (Judicial Council of Cal., Crim. Jury Instns. (2025) Bench Notes to CALCRIM No. 359, p. 132.)

Turning to the merits, there is no reasonable probability the jury understood it could convict Perez under a reduced standard of proof or that the outcome would have been more favorable absent the alleged error. The instructions, viewed as a whole, emphasized that guilt must be proven beyond a reasonable doubt. CALCRIM No. 359 itself contained that

16

requirement, and CALCRIM No. 220 defined "reasonable doubt," explained that it applied to every element, and directed that the jury must acquit unless guilt was established to that standard. Taken together, these instructions correctly conveyed the prosecution's burden, foreclosing any realistic possibility the jury relied on a lesser standard. (See *Ramos, supra*, 163 Cal.App.4th at p. 1088 [jurors are presumed intelligent and capable of following instructions].)

Moreover, nothing in the record suggests the jury relied on CALCRIM No. 359 to establish identity. Perez's statements to Guerra occurred *before* the shooting and therefore could not have identified him as the shooter. His statements to Summer, made after the shooting, contained no reference to the crime. The jury was also expressly instructed that some instructions might not apply depending on its factual findings and to follow only those that did. Because Perez's statements were not inculpatory on the issue of identity, there was simply no evidence to which CALCRIM No. 359 could have applied. Accordingly, even if the instruction was erroneous, it was harmless beyond any reasonable doubt.

## DISPOSITION

The judgment is affirmed.

IRION, Acting P. J.

WE CONCUR:


BUCHANAN, J.


RUBIN, J.